ORIGINAL
FILED

SEP - 3 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  JULIO J. RAMOS (SBN. 189944)
   ramosfortrustee@yahoo.com
2  LAW OFFICES OF JULIO J. RAMOS
   35 Grove Street, Suite 107
3  San Francisco, California 94102
   Telephone:    (415) 948-3015
4  Facsimile:    (415) 469-9787

5  Attorneys for Plaintiff  MARTHA FLOREZ dba USULUTAN RESTAURANT

6

7            UNITED STATES DISTRICT COURT            E-filing

8            NORTHERN DISTRICT OF CALIFORNIA

9

10  MARTHA FLOREZ dba USULUTAN          )  Case No.
    RESTAURANT on behalf of itself and all others  )
11  similarly situated                  )  CLASS ACTION COMPLAINT
                                        )
12          Plaintiffs,                 )
                                        )
13      vs.                             )
                                        )
14  IDAHOAN FOODS, LLC; UNITED POTATO   )
    GROWERS OF IDAHO, INC.; UNITED POTATO )
15  GROWERS OF AMERICA, INC.;           )
    UNITED II POTATO GROWERS OF         )
16  IDAHO, INC.; ALBERT WADA; WADA      )
    FARMS, INC.; WADA FARMS             )
17  POTATOES, INC.; WADA-VAN ORDEN      )
    POTATOES, INC.; WADA FARMS          )
18  MARKETING GROUP, LLC; DOLE          )
    FRESH VEGETABLES, INC; DOLE         )
19  FOOD CO.; BLAINE LARSEN FARMS,      )
    INC.; POTANDON PRODUCE LLC;         )
20  GENERAL MILLS, INC.; MICHAEL        )
    CRANNEY d/b/a CRANNY FARMS;         )
21  CORNELISON FARMS, INC.; SNAKE       )
    RIVER PLAINS POTATOES, INC.;        )
22  DRISCOLL POTATOES, INC.; LANCE      )
    FUNK d/b/a LANCE FUNK FARMS;        )
23  RIGBY PRODUCE, INC.; PLEASANT       )
    VALLEY POTATO, INC.; RD OFFUTT      )
24  CO.; AND BAYER CROPSCIENCE LLP,     )
                                        )
25                                      )
                                        )
26  Defendants.                         )  DEMAND FOR JURY TRIAL
                                        )
27  _____)

28  CLASS ACTION COMPLAINT

1

2

**INTRODUCTION**

3

1.      Plaintiff and Class Representative MARTHA FLOREZ dba USULUTUAN

4

RESTAURANT ("Plaintiff") brings this action individually and on behalf of a Class

5

consisting of all California indirect purchasers of fresh and process potatoes from

6

Defendants and their coconspirators from July 29, 2006 to the present (the "Class

7

Period").  The Defendants include individual growers and national produce companies;

8

marketing and shipping agencies working as agents of and under the control of individual

9

growers and produce companies; and an Idaho potato cooperative, which, in turn with

10

other regional cooperatives, makes up the United Potato Growers of America, Inc.

11

("UPGA") a national cooperative through which Defendants have coordinated and

12

facilitated their price-fixing conspiracy on a national and international scale.

13

2.      Idaho is the nation's leading producer of potatoes, with 29% of total production in

14

2006. Nine other states—Washington, Wisconsin, North Dakota, Colorado, Minnesota,

15

Oregon, Maine, Montana and California--produced an additional 59% of the nation's

16

potato crop. Nationally, yields have soared, rising from 231 hundredweight per acre in

17

1971 to 393 hundredweight per acre in 2006.

18

3.      Over 50 percent of potato sales are to processors for french fries, chips,

19

dehydrated potatoes, and other potato products. The remainder goes to the fresh market.

20

4.      Plaintiff alleges a conspiracy among Defendants and certain unnamed

21

coconspirators wherein these entities agreed to fix, raise, maintain and/or stabilize the

22

prices at which fresh and process potatoes (collectively "potatoes") were sold in the

23

United States by controlling and reducing the aggregate supply of potatoes. Each

24

Defendant knew that it could not fix prices by itself and that supply could only be

25

restrained by collective action. Thus, Defendants entered into an admitted and

26

overarching agreement to manage the supply of potatoes in the United States for the

27

CLASS ACTION COMPLAINT

28

1   purpose of elevating the sales prices of fresh and process potatoes. During the Class

2   Period, Defendants implemented this price-fixing and supply management

3   conspiracy by agreeing to take several coordinated actions including, among other

4   methods: 1) agreeing to limit potato planting acreages; 2) agreeing to pay farmers to

5   destroy existing stocks or not to grow additional potatoes; 3) and agreeing to reduce the

6   overall number of potatoes available for sale. Furthermore, Defendants implemented

7   secondary market strategies designed to limit the flow of potatoes to the market when

8   prices were low so that those prices could be increased.

9   5.      In order to facilitate the massive price-fixing and supply-restriction conspiracy

10   alleged herein, the Defendants, including the largest potato growers and shippers in the

11   United States, first came together in 2004 to form regional and nationwide "cooperatives"

12   not for the purpose of marketing and selling their potato products collectively (as is the

13   function of a traditional, small-scale cooperative) - but rather for the sole purpose of

14   creating a national vehicle for potato growers and their co-conspirators to conspire

15   together to reduce potato output and fix prices.  For example, in the 2005 and 2006 crop

16   year, the producer price index for fresh potato increased 94% from the 2004 and 2006

17   crop year.  Source Table P-9--U.S. potatoes: Monthly wholesale price indexes (PPI),

18   2000-09 USDA *Vegetables and Melons Outlook*/VGS-339/June 24, 2010.

19   Economic Research Service, USDA.

20   6       Defendants erroneously touted immunity for their price-fixing activities under the

21   1922 Capper-Volstead Act (7 U.S.C. §§ 291-92), which provides a limited exemption

22   from the application of the antitrust laws to associations and cooperatives comprised of

23   certain agricultural producers. As discussed herein, Defendants have taken numerous,

24   overt actions that destroy the applicability of any potential immunity that may have been

25   provided under this Act and, as such, the limited protections of the Capper-Volstead Act

26   do not apply.

27

28

-2-

CLASS ACTION COMPLAINT

7.     Plaintiff's Complaint details the classic cartel behavior that Defendants and their co-conspirators exhibited, describing Defendants' admitted collusion; admitted monitoring and policing of the cartel; admitted impact on market price from the cartel's activities; and admitted pressure on fellow cartelists, including "punitive" measures imposed on any cartelists who violated the price-fixing agreement.

8.     Defendants analogized their potato cartel to the Organization of Petroleum Exporting Countries ("OPEC")—the notorious petroleum supply-reduction and price-fixing cartel composed of various foreign nations. Defendants suggested that they should "study" the OPEC model and were referred to as the "OPEC of Potatoes."

9.     Defendants' supply-reduction and price-increase conspiracy has been a resounding success. Defendants are not entitled to any immunity for their unlawful actions, and Plaintiff requests herein that Defendants be found to be liable to the Plaintiff and the Class for the extensive damages caused by their per se illegal supply-reduction and price-fixing conspiracy.

10.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), because this action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Sections 4 and 16 of the Clayton Ac t(15 U.S.C. §§ 15(a) and 26). The Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed class are citizens of a state different from the Defendants and may exercise supplemental jurisdiction under California's Unfair Competition Law and Cartwright Act.

**JURISDICTION AND VENUE**

11.     Venue is proper because Defendants reside, are found, have agents, and transact

CLASS ACTION COMPLAINT

1   business in this District as provided in 28 U.S.C. § 1391(b) and (c) and in Sections 4 and

2   12 of the Clayton Act (15 U.S.C. §§ 15 and 22).

3   12.     This Court has personal jurisdiction over Defendants because, *inter alia*, they: (a)

4   transacted business throughout the United States, including in this District; (b) had

5   substantial contacts with the United States, including in this District; and/or (c) were

6   engaged in an illegal anticompetitive scheme that was directed at and had the intended

7   effect of causing injury to persons residing in, located in, or doing business throughout

8   the United States, including in this District.

9   **PLAINTIFF**

10  11.     Plaintiff MARTHA FLOREZ dba USULUTAN RESTAURANT ( "USULUTAN

11  RESTAURANT") does business under the laws of California with its principal places of

12  business in San Francisco. During the Class Period USULUTAN RESTAURANT

13  indirectly purchased potatoes directly from one or more of the Defendants.  As a result of

14  the federal antitrust law violations described herein, Plaintiff was injured in its business

15  or property.

16  **DEFENDANTS**

17  **I. Potato Cooperatives**

18  **A. United Potato Growers of America, Inc.**

19  12.     Defendant UPGA is a non-profit corporation organized, existing, and doing

20  business under the laws of Utah with its offices and principal place of business located in

21  Salt Lake City, Utah. During the Class Period, UPGA participated in and facilitated the

22  supply restriction and price-fixing scheme as alleged herein.

23  13.     As of November, 2007, UPGA has eight member cooperatives, that include

24  growers from California, Colorado, Idaho, Kansas, Montana, Nebraska, New Mexico,

25  Oklahoma, Oregon, Texas, Washington, and Wisconsin. These members produce

26  approximately 70% of the nation's fresh market potatoes. United Potato Growers of

27

28  -4-
    CLASS ACTION COMPLAINT

1    Canada, which represents 96 percent of Canadian potato acreage, was formed in 2006 in

2    conjunction with UPGA, and participates with UPGA through a memorandum of

3    understanding and through At Large individual memberships.

4    14.    UPGA's stated mission is to "manage national potato supply so as to positively

5    affect grower profitability." It achieves this goal primarily by limiting potato-planting

6    acreage among its members, including its ten member cooperatives: United At-Large Co-

7    op; United Fresh Potato Growers of Colorado; United Potato Growers of Idaho; Kern

8    Produce Shippers; United Fresh Potato Growers of the Klamath Basin; United Potato

9    Growers of Montana; Red River Valley Fresh Potato Growers Cooperative; United

10   Southwest Potato Growers; United Fresh Potato Growers of Washington/Oregon; and

11   United Potato Growers of Wisconsin. UPGA also coordinates market calls among

12   competitors so that the co-conspirators can limit the flow of potatoes to the market when

13   prices are low in order to further increase prices.

14   15.    UPGA was formed in March of 2005. Since its formation, UPGA has assisted

15   regional potato cooperatives and their individual grower members in their collective

16   efforts to restrict supply and fix prices by designing, proposing, and implementing

17   various price-fixing initiatives, including acreage buy-down programs; crop-reduction

18   programs; and flow-control programs designed to prevent market "glut."

19   16.    UPGA has also provided professional leadership, data-gathering and analysis

20   capabilities, guidance to growers, and served as a forum for regional cooperatives to

21   share information about their supply-restriction efforts.

22   17.    Since 2008, according to its website, UPGA has operated a United Potato Partners

23   sponsorship program, which is described as "support[ing] the underwriting of United's

24   databases, administration and educational seminars. The seminars provide a means for

25   direct, two-way communication with potato growers."

26   18.    UPGA's price-fixing and capacity reduction efforts are not limited to the United

27                                                        -5-

28   CLASS ACTION COMPLAINT

1  States. From its inception, UPGA directors have periodically met and conspired with

2  Canadian and other international growers to encourage similar supply-restriction efforts

3  throughout North America and the world. UPGA played an instrumental role in the

4  creation of its Canadian counterpart, the United Potato Growers of Canada ("UPGC").

5  The two have worked together closely ever since to manage potato supply for the entire

6  North American market.

7  **B. United Potato Growers of Idaho, Inc.**

8  19.    Defendant United Potato Growers of Idaho, Inc. (formerly known as "United

9  Fresh Potato Growers of Idaho") ("UPGI") is a corporation organized, existing, and

10  doing business under the laws of Idaho with its offices and principal place of business

11  located in Idaho Falls, Idaho. During the Class Period, UPGI participated in the supply-

12  restriction and pricefixing scheme as alleged herein.

13  20.    UPGI is a founding cooperative member of UPGA.

14  21.    The North American potato cartel originated with UPGI and its founders. In

15  2004, 23 Idaho potato growers—who collectively accounted for 60% of the fresh

16  potatoes produced in Idaho and 25% of the fresh-potato market in the United States—met

17  and agreed to collectively reduce potato supplies and fix prices under the banner of the

18  newly formed UPGI. Within one year, UPGI had received commitments to reduce potato

19  supply from farmers responsible for approximately 91% of the fresh potato acreage in

20  Idaho.

21  22.    UPGI employed numerous forms of supply management to fix the prices of fresh

22  and process potatoes, including its initial efforts of donating potatoes to charitable

23  organizations and imposing "shipping holidays" during which each potato-packing

24  operation would shut down for at least a single shift. UPGI also began the acreage

25  limitations outlined herein that UPGA eventually adopted and promoted on a nationwide

26  basis.

27

CLASS ACTION COMPLAINT

28

23.     As part of this collusive activity, UPGI has engaged in the practices, *inter alia*, of: (a) disseminating to its members annual "planting guidelines" aimed at reducing capacity and thereby keeping prices for potatoes high; and (b) developing and disseminating a Grower Return Index ("GRI") aimed at measuring the profitability thereby obtained by following its policies.

24.     UPGI's charter included as one of its purposes the goal of working with similar cooperatives in other potato-growing states to manage supply. That effort was extraordinarily successful. By 2005, UPGI's founders had colluded with all of the potato trade groups in Idaho and met with growers in numerous states to help form regional cooperatives all over the country.

25.     Defendant Albert Wada—an Idaho grower who helped create UPGI—gathered these other regional representatives in 2005 and with them formed the nationwide cooperative, Defendant UPGA.

26.     In 2009, after some members had left the group, UPGI announced it would disband if it was unable to reach its membership goal of controlling 80% of Idaho's fresh potato acreage. In late 2009, UPGI announced that the membership drive was successful; membership had reached 80% and the organization would continue.

**C. United II Potato Growers of Idaho, Inc.**

27.     Defendant United II Potato Growers of Idaho, Inc. ("United II") is a corporation organized, existing, and doing business under the laws of Idaho with its offices and principal place of business located in Idaho Falls, Idaho. During the Class Period, United II participated in the supply-restriction and price-fixing scheme as alleged herein.

28.     In 2007, UPGI formed United II, a second cooperative made up of UPGI members in order to further its efforts to restrict supply by integrating with and owning potato processing plants. United II created a joint venture with Defendant RD Offutt Co. (the largest potato grower in the country) and Defendant Idahoan Foods, LLC (initially

CLASS ACTION COMPLAINT

1    known as North American Foods, LLC). Idahoan Foods LLC is one of the largest potato

2    dehydrators in the country, and the United II grower-owners supply all the potatoes for its

3    Idaho and Nevada plants.

4    29.    The purpose of the joint venture is two-fold. First, it provides the grower-owners

5    with an outlet for surplus potatoes, thereby assisting UPGI's supply-restriction efforts.

6    Second, it enables the grower-owners to integrate vertically and receive dividends from

7    their investment.

8    **II. Potato Growers, Packers, Marketing Agencies, and Licensors**

9    **A. Wada Farms Co-Conspirators**

10   **Wada Farms, Inc; Wada Farms Potatoes, Inc.; Wada-Van Orden Potatoes,**

11   **Inc.; and Albert Wada**

12   30.    Defendant Wada Farms, Inc. is a corporation organized, existing, and doing

13   business under the laws of Idaho with its offices and principal place of business located

14   in Blackfoot, Idaho. During the Class Period, Wada Farms, Inc. participated in the supply

15   restriction and price-fixing scheme as alleged herein.

16   31.     Defendant Wada Farms Potatoes, Inc. is a corporation organized, existing, and

17   doing business under the laws of Idaho with its offices and principal place of business

18   located in Blackfoot, Idaho. During the Class Period, Wada Farms Potatoes, Inc.

19   participated in the supply-restriction and price-fixing scheme as alleged herein.

20   32.    Defendant Wada-Van Orden Potatoes, Inc. is a corporation organized, existing,

21   and doing business under the laws of Idaho with its offices and principal place of

22   business located in Blackfoot, Idaho. During the Class Period, Wada-Van Orden

23   Potatoes, Inc. participated in the supply-restriction and price-fixing scheme as alleged

24   herein.

25   33.    Wada Farms, Inc.; Wada Farms Potatoes, Inc; and Wada-Van Orden Potatoes,

26   Inc. are collectively referred to herein as "Wada Farms."

27

28   CLASS ACTION COMPLAINT

-8-

34.     Wada Farms operates an irrigated farming enterprise in Southeastern Idaho growing fresh and process potatoes, seed and commercial wheat, corn, alfalfa, sugar beets, and hybrid canola seed. Established in 1943, Wada Farms operates in six diversified farming locations in three counties, totaling around 30,000 irrigated acres. The Wada enterprise also includes a fresh potato, onion, and sweet potato marketing group, a 140,000 square foot fresh potato packing warehouse, and a trucking company.

35.     Growing over a billion potatoes annually, Wada Farms is among the largest growers and packers in the industry. In 2008, Wada Farms' gross revenue exceeded $200 million. Wada Farms employs 360 full-time employees with season harvest employment at about 700 people.

36.     In addition to numerous national co-packers, Wada Farms has potato co-packing agreements with entities in California, Washington, Idaho, Colorado, Nebraska, North Dakota, Wisconsin, Illinois, Minnesota, Kentucky, Alabama, Georgia, New York, Pennsylvania, Maine, Missouri, Florida, North Carolina, Pennsylvania, New Jersey and Massachusetts.

37.     Defendant Albert Wada is the Chairman and former CEO of Wada Farms. Albert Wada is domiciled and residing at 1385 W Highway 39, Pingree, ID 83262-1126.

38.     Albert Wada was one of the masterminds of the price-fixing scheme alleged herein. Wada Farms, through Albert Wada, played a critical role in the formation of UPGI and UPGA and the implementation of the supply reduction conspiracy.

39.     In 2004, Mr. Wada began announcing his desire to unite potato growers, decrease competition, and "rationalize" the industry through curtailed production.

40.     In September of 2004, Mr. Wada and Keith Cornelison (of Defendant Cornelison Farms) called a meeting of 23 Idaho potato farmers to discuss how to "curb protection" and "boost prices," and shortly after the meeting the group of farmers agreed to create UPGI.

CLASS ACTION COMPLAINT

41.     While serving as chairman of the UPGI Board, Mr. Wada also met with other regional growers and cooperatives and set about creating UPGA. As one of the nation's largest potato growers, Albert Wada has been a leading member of UPGI and UPGA since their inceptions and he has served in numerous executive positions in those cooperatives.

42.     Later, as UPGA chairman, Mr. Wada encouraged growers and grower cooperatives all over the United States to join the supply-reduction effort; met with Canadian growers to discuss the creation of a Canadian equivalent of the UPGA; espoused the benefits of "supply management and grower solidarity"; and helped craft UPGA initiatives to achieve supply reduction.

43.     In an interview about the initiation of the price fixing cooperatives, Mr. Wada noted, "(I) and a few other grower competitors and colleagues established the United Potato Growers of Idaho in November of 2004 and then the United Potato Growers of America in March of 2005 . . . We started the cooperative here in Idaho in the fall of 2004 out of economic necessity. Because of the dire financial straights (sic), potato growers found strength in numbers. We formed this cooperative and expanded it so it had national scope in order to gain the cooperation of nationwide growers to work with Idaho, the largest potato producing state in the United States. **It's essentially been a huge benefit to Wada Farms and our financial health as potato growers in that we've been able to work with other producers across North America to stabilize the fresh potato growing business.** So far, it's been quite an advantage for us to have been involved in. Yes, the cooperative has costs of membership, but these costs are a small price to pay to be able to remove some of the big risk in potato production." (emphasis added).

44.     This same interview also quoted Mr. Wada as stating, "**United Potato Growers**

-10-

CLASS ACTION COMPLAINT

1  **Cooperatives and its market intelligence information-gathering systems**

2  **and supply management programs helped potato growers to sustain an**

3  **unprecedented four years of relatively stable and profitable potato pricing.**"

4  (emphasis added).

5  **Wada Farms Marketing Group, LLC**

6  45.     Defendant Wada Farms Marketing Group, LLC ("Wada Farms Marketing") is a

7  limited liability company organized, existing, and doing business under the laws of Idaho

8  with its offices and principal place of business located in Pingree, Idaho. During the Class

9  Period, Wada Farms Marketing participated in the supply-restriction and price-fixing

10  scheme as alleged herein.

11  46.     Wada Farms Marketing acts as the agent of and handles the marketing and sales

12  for Wada Farms and Dole-label potatoes, onions, and sweet potatoes. Wada Farms

13  Marketing has offices in Idaho, Oregon and Texas and distributes potatoes throughout the

14  United States.

15  47.     Wada Farms Marketing holds the exclusive marketing agreement for all potatoes,

16  onions, and sweet potatoes sold under the national Dole label. The Wada Farms website

17  notes: Our relationship with Dole started approximately 15 years ago based on a

18  mutual commitment to provide the highest quality products and service to

19  every customer. The Dole brand has been around for over a century and

20  means the finest, high-quality products. Through Wada Farms Marketing

21  Group, Dole will continue to meet customers' expectations by consistently

22  providing potatoes and onions that meet the highest standard. With the

23  combined program and experience of Wada Farms, there are unlimited

24  opportunities with the National Dole label for potatoes, onions, and sweet

25  potatoes. For Wada and Dole, anything less is unacceptable.

26  48.     Wada Farms Marketing has a close relationship with Defendants Dole Fresh

27                                          -11-

CLASS ACTION COMPLAINT

28

1   Vegetables, Inc. and Dole Food Company, Inc. For example, in 2009, it was instrumental

2   in developing the United States marketplace for the Dole brand sweet potato.

3   49.    As the sales and marketing arm of Wada Farms, Wada Farms Marketing

4   participated in and benefited from the conspiracy. Albert Wada, as discussed more fully

5   herein,

6   organized and attended numerous UPGI and UPGA conspiracy meetings on behalf of

7   both Wada Farms and Wada Farms Marketing and was an outspoken advocate for

8   concerted supply restriction.

9   50.    Wada Farms controls Wada Farms Marketing and Wada Farms Marketing acted

10   pursuant to that control.

11   51.    Wada Farms Marketing acted as Wada Farms' agent. Albert Wada, Wada Farms

12   Marketing and Wada Farms are collectively referred to herein as "Wada Defendants."

13   **Dole Fresh Vegetables, Inc.**

14   52.    Defendant Dole Fresh Vegetables, Inc. ("Dole Fresh Vegetables") is a

15   corporation organized, existing, and doing business under the laws of California with

16   offices and its principal place of business located in Monterey, California. During the

17   Class Period, Dole Fresh Vegetables participated in the supply-restriction and price-

18   fixing scheme as alleged herein.

19   53.    Dole Fresh Vegetables is a division of Defendant Dole Food Company, Inc.

20   54.    Dole Fresh Vegetables sources, harvests, distributes and markets over 35 varieties

21   of fresh vegetables, including iceberg lettuce, celery, cauliflower, red and green leaf

22   lettuce, romaine lettuce, butter lettuce, spinach, spring mix, broccoli, Brussels sprouts,

23   green onions, asparagus, snow peas, radishes and artichokes.

24   55.    Dole Fresh Vegetables has exclusive licensing agreements for a line of potatoes

25   and onions with the Wada Defendants and with other producers for other vegetables.

26   56.    Dole Fresh Vegetables is a participant in various trade associations frequented by

27                                          -12-

CLASS ACTION COMPLAINT

28

potato marketers, growers or potato growing cooperatives, such as the United Fresh Produce Association and the Produce Marketing Association.

57.     Dole Fresh Vegetables is an authorized out-of-state potato broker with the Idaho Potato Commission.

**Dole Food Company, Inc.**

58.     Defendant Dole Food Company, Inc. ("Dole Food") is a corporation organized, existing, and doing business under the laws of Delaware with its principal executive offices located in Westlake Village, California. During the Class Period, Dole Food participated in the supply-restriction and price-fixing scheme as alleged herein.

59.     Founded in Hawaii in 1851, Dole Food had 2007 revenues of $6.9 billion, is the world's largest producer and marketer of fresh fruit and vegetables. Dole Food does business throughout the United States and in more than 90 countries and employs, on average, 36,000 full-time, regular employees and 23,000 full-time seasonal or temporary employees worldwide.

60.     Dole Fresh Vegetables and Dole Food are referred to collectively herein as "Dole Defendants."

61.     As the licensor of potatoes sold by the Wada Defendants, the Dole Defendants had control over many aspects of the marketing, selling, packaging, quality, and branding of these potatoes. Based upon information and belief, the Dole Defendants were aware of, endorsed, and profited from the price-fixing scheme alleged herein. As the exclusive marketer of "Dole" brand onions, potatoes and sweet potatoes, the Wada Defendants enjoyed frequent contact with and supervision from Dole representatives.

62.     The Wada Defendants acted as the Dole Defendants' agent in participating in the price-fixing and capacity reduction scheme alleged herein.

63. Throughout the Class Period, the Dole Defendants exercised actual or apparent

-13-

CLASS ACTION COMPLAINT

authority over the Wada Defendants as those Wada entities publicly and repeatedly announced their intentions to reduce potato supplies nationwide and encouraged competitors to do the same.  The Dole Defendants invested authority in the Wada Defendants to act on Dole's behalf, including by reducing the supply of Dole-branded potatoes, despite knowing of the Wada Defendants' efforts to restrict potato supplies and fix prices nationwide with their coconspirators.

64.     Dole Defendants and Wada Defendants made representations to various third parties and the public concerning their relationship, and these representations gave rise to areasonable belief that the Wada Defendants possessed authority to act on Dole Food's behalf. Inparticular, the Wada Defendants issued releases to the press and on the Wada website detailingthe Dole/Wada relationship and confirming that Wada was acting on Dole's behalf and as Dole's agent in the production, marketing and sales of Dole potatoes.

65.     Dole Food's business relationship with the Wada Defendants began approximately fifteen years ago and has only increased since then.

66.     An article on Groceryheadquarters.com discussed the relationship between Dole Food and the Wada Defendants: In existence since 1901, the Dole brand has steadily increased its presence in the produce case. Its latest offering is a line of packaged salad kits that offer consumers extremely convenient, yet healthy, side dish and main meal options that include gourmet toppings, proprietary dressings and unique flavor combinations."The Brand Institute places Dole in a group of 20 food companies with the highest (unaided) consumer awareness in North America," says Bil Goldfield, communications manager of the fresh fruit and vegetables division of Dole Food Co., based in Westlake Village, Calif. Dole's potatoes and onions are packed by Idaho Falls, Idaho-based Wada Farms. "For a retailer who is maybe not promoting his own label, but is looking for something to indicate to his constituents that his store carries

-14-

CLASS ACTION COMPLAINT

1  value and quality, Dole definitely brings that to the table for them," says Kevin Stanger,

2  [Wada] vice president, sales and marketing. "I believe that national brands, and Dole

3  specifically, has a very good presence and recognition amongst consumers for value and

4  quality. A lot of retailers want and respect that."

5  **B. Larsen Farms/Potandon Co-Conspirators**

6  **Blaine Larsen Farms, Inc.**

7  67.      Defendant Blaine Larsen Farms, Inc. ("Larsen Farms") is a corporation organized,

8  existing, and doing business under the laws of Idaho with its offices and principal place

9  of business located in Hamer, Idaho. During the Class Period, Larsen Farms participated

10  in the supply-restriction and price-fixing scheme as alleged herein.

11  68.      Larsen Farms grows, packs, and distributes potatoes under the Larsen Farms

12  brand and private labels. Larsen Farms operates farmland and facilities in Idaho,

13  Nebraska, and Colorado and services retail and food-service customers worldwide. The

14  company also makes processed potato products (crushed, diced, flaked, and sliced),

15  which it supplies to food processors.

16  69.       Larsen Farms grows, stores, processes, and transports its own potatoes and refers

17  to itself as a "vertically integrated potato grower."

18  70.      Blaine Larsen of Larsen Farms was one of the founders of UPGI, a UPGI Board

19  Member, and an originator of the price-fixing scheme alleged herein.

20  **Potandon Produce LLC**

21  71.      Defendant Potandon Produce LLC ("Potandon") is a limited liability company

22  organized, existing, and doing business under the laws of Idaho with its offices and

23  principal place of business located in Idaho Falls, Idaho. During the Class Period,

24  Potandon participated in the supply-restriction and price-fixing scheme as alleged herein.

25  72.      Once a division of Pillsbury, Potandon is now an independent company owned by

26

27                                          -15-

28  CLASS ACTION COMPLAINT

1   five prior Pillsbury managers and six grower/shippers who control the company's

2   operations. With over 45,000 acres and six packing facilities in Idaho, Potandon sells

3   potatoes and onions to major retailers, club stores, wholesalers, produce distributors, and

4   restaurant chains, across the United States at the direction, on behalf of and/or as the

5   agent of its grower/shippers.

6   73.     In June 2002, Potandon merged the sales and marketing activities from the Idaho

7   Fresh Cooperative ("IFC") into its operations. IFC is a 70 grower cooperative with over

8   25,000 acres of potatoes and six packing sheds located throughout the Snake River

9   Valley.

10   74.     In June 2002, Potandon also merged the sales and marketing activities for High

11   Country Potato, located in Rexburg, Idaho.

12   75.     Two Washington grower/shippers (Harvest Fresh Produce in Othello and Balcom

13   & Moe of Pasco) merged with Potandon in June of 2005. In January of 2006, Potandon

14   merged with Murakami Produce, the largest supplier of onions in the Idaho/Oregon

15   region. In October 2006, Potandon merged the sales activities for Defendant Larsen

16   Farms into Potandon.

17   76.     Outside of Idaho, Potandon has established an extensive network of over 60

18   potato and onion co-packers in 24 states with another nine co-packers in Canada. In

19   addition, Potandon is involved in multiple joint venture growing areas and has several

20   exclusive sales agreements.

21   77.     By combining these sales and marketing functions of its growers, Potandon has

22   positioned itself as the largest marketer of potatoes in North America. Potandon controls

23   a 25% share of the Idaho potato market and a 12% share of the total national potato

24   market.

25   78.     Potandon owns the exclusive licensing rights to the Green Giant® brand for fresh

26

27                                      -16-

CLASS ACTION COMPLAINT

28

1  potatoes and onions (pursuant to an agreement with Defendant General Mills). Potandon

2  also markets SunSpiced potatoes.

3  79.     Potandon sells potatoes throughout the United States. It solicits internet sales of

4  potatoes on its website at http://www.potandon.com/contact.htm.

5  80.     Potandon is owned and/or controlled by its suppliers and has conspired with its

6  potato growers to assist in efforts to reduce potato supplies and fix prices and has directly

7  profited from the price-fixing scheme detailed herein.

8  **General Mills, Inc.**

9  81.     Defendant General Mills, Inc. ("General Mills") is a corporation organized,

10  existing, and doing business under the laws of Delaware with its offices and principal

11  place of business located in Minneapolis, Minnesota.

12  82. General Mills is an authorized out-of-state processor with the Idaho Potato

13  Commission.

14  83.     As the licensor of potatoes sold by the Potandon Defendants under the trademark

15  "Green Giant Fresh®", General Mills had, through its exclusive licensing agreement,

16  control over many aspects of marketing, selling, packaging, quality, and branding of

17  these potatoes. General Mills' involvement with Potandon's operations includes

18  specifying and designing packaging, designing and managing cross promotions,

19  headquarters sales calls, quality and safety standards, and inspecting potato growing and

20  packaging operations.

21  84.     Promotional materials distributed by Potandon stated that the "Green Giant

22  Fresh®" potatoes were grown under a "stringent quality control program" and discussed

23  "regular visits to all approved packing facilities."

24  85.     Potandon describes itself on its website as the "[e]xclusive sales agent for Green

25  Giant Fresh potatoes and onions."

26  86.     General Mills was aware of, endorsed, and profited from the price-fixing scheme

27                                          -17-

28  CLASS ACTION COMPLAINT

1  alleged herein.

2  87.     Potandon and its growers acted as General Mills's agents in participating in the

3  price-fixing scheme alleged herein. In their capacity as agents of General Mills, Potandon

4  and its growers reduced potato supply and encouraged other growers to do the same.

5  88.     As the exclusive licensor of the "Green Giant Fresh®" trademark, Potandon

6  enjoys frequent contact with and supervision from General Mills representatives.

7  89.     Throughout the Class Period, General Mills exercised actual or apparent authority

8  over Potandon and its growers as those entities publicly and repeatedly announced their

9  intentions to reduce potato supplies nationwide and encouraged competitors to do the

10  same. General Mills invested authority in the Potandon and its growers to act on General

11  Mills's behalf, including by reducing the supply of Green Giant-branded potatoes, despite

12  knowing of Potandon's and its growers' efforts to restrict potato supplies and fix prices

13  nationwide with their co-conspirators.

14  90.     General Mills and Potandon made representations to various third parties and the

15  public concerning their relationship, and these representations gave rise to a reasonable

16  belief that Potandon and its growers possessed authority to act on General Mills's behalf.

17  In particular, Potandon issued releases to the press and on the Potandon website detailing

18  the Green Giant/Potandon relationship and confirming that Potandon was acting on

19  General Mills's behalf and as the agent of General Mills in the production, marketing and

20  sales of Green Giant potatoes.

21  **C. Other Growers**

22  **Michael Cranney (Cranney Farms)**

23  91.     Defendant Michael Cranney is an individual doing business as Cranney Farms, an

24  assumed business name under the laws of Idaho, located in Oakley, Idaho. Michael

25  Cranney is 20 domiciled and residing at 503 W. 1300 S., Oakley, Idaho 83346. During

26  the Class Period,

27                                          -18-

28  CLASS ACTION COMPLAINT

1  Michael Cranney participated in the supply-restriction and price-fixing scheme as alleged

2  herein.

3  92.     Cranney Farms grows process and fresh potatoes, sugar beets, corn, wheat and

4  barley.

5  93.     Michael Cranney of Cranney Farms is a founding member of UPGI and one of the

6  original incorporators of UPGA. At a January 2008 UPGA meeting, Mr. Cranney, UPGA

7  Supply Management Committee Chairman, reminded grower attendees of UPGA's

8  instruction to reduce potato acreage in the coming year by 5%—and told the audience

9  that UPGA would advise even non-members to do the same.

10  **Cornelison Farms, Inc.**

11  94.     Defendant Cornelison Farms, Inc. ("Cornelison Farms") is a corporation

12  organized, existing, and doing business under the laws of Idaho, and its principal place of

13  business is located in Rexburg, Idaho. During the Class Period, Cornelison Farms

14  participated in the supply-restriction and price-fixing scheme as alleged herein.

15  95.     Cornelison Farms grows, packages, and ships fresh potatoes.

16  96.     With Mr. Wada, Keith Cornelison of Cornelison Farms organized the first

17  meeting of growers in September 2004 of what would eventually become the UPGI.

18  Cornelison Farms is a founding member of UPGI and has long advocated for collective

19  action to reduce potato supplies.

20  **Snake River Plains Potatoes, Inc.**

21  97.     Defendant Snake River Plains Potatoes, Inc. ("Snake River Plains Potatoes") is a

22  corporation organized, existing, and doing business under the laws of Idaho, and its

23  principal place of business is located in Rexburg, Idaho. During the Class Period, Snake

24  River Plains Potatoes participated in the supply-restriction and price-fixing scheme as

25  alleged herein.

26  98.     Snake River Plains Potatoes is an integrated potato producer that grows, packs,

27

28

-19-

CLASS ACTION COMPLAINT

1  stores, and ships its own potatoes.

2  99.      Snake River Plains Potatoes is a founding member of UPGI and a UPGA

3  member. David Beesley, chief executive officer of Snake River Plains Potatoes, is a

4  member of the UPGA executive committee.

5  **Driscoll Potatoes, Inc.**

6  100.      Defendant Driscoll Potatoes, Inc. ("Driscoll Potatoes") is a corporation organized,

7  existing, and doing business under the laws of Idaho, and its principal place of business is

8  located in American Falls, Idaho. During the Class Period, Driscoll Potatoes participated

9  in the supply-restriction and price-fixing scheme as alleged herein.

10  101.      Driscoll Potatoes is an integrated potato producer that grows, packs, stores, and

11  ships its own potatoes.

12  102.      Driscoll Potatoes is a founding member of UPGI, and Loraine Driscoll of Driscoll

13  Potatoes is an original incorporator of UPGA. Loraine Driscoll has served on the UPGA

14  Board of Directors.

15  **Lance Funk (Lance Funk Farms)**

16  103.      Defendant Lance Funk is an individual doing business as Lance Funk Farms, an

17  assumed business name under the laws of Idaho, located in American Falls, Idaho. Lance

18  Funk is domiciled and residing at 3853 Rast Rd., American Falls, Idaho 83211. During

19  the Class Period, Lank Funk participated in the supply-restriction and price-fixing

20  scheme as alleged herein.

21  104.      Lance Funk Farms is a potato grower.

22  105.      Lance Funk Farms is a founding member of UPGI.

23  **Rigby Produce, Inc.**

24  106.      Defendant Rigby Produce, Inc. ("Rigby Produce") is a corporation organized,

25

26

27                                                    -20-

28

1   existing, and doing business under the laws of Idaho and is located in Rigby, Idaho.

2   During the Class Period, Rigby Produce participated in the supply-restriction and price-

3   fixing scheme as alleged herein.

4   107.    Rigby Produce is an integrated potato producer that grows, packs, stores, and

5   ships its own potatoes.

6   108.    Rigby Produce is a founding member of UPGI.

7   **Pleasant Valley Potato, Inc.**

8   109.    Defendant Pleasant Valley Potato, Inc. ("Pleasant Valley Potato") is a corporation

9   organized, existing, and doing business under the laws of Idaho and is located in

10  Aberdeen, Idaho. During the Class Period, Pleasant Valley Potato participated in the

11  supply-restriction and price-fixing scheme as alleged herein.

12  110.    Pleasant Valley Potato is an integrated potato producer that grows, packs, stores,

13  and ships its own potatoes.

14  111.    Pleasant Valley Potato is a founding member of UPGI.

15  **Raybould Brothers Farms LLC**

16  112.    Defendant Raybould Brothers Farms LLC ("Raybould Brothers Farms") is a

17  limited liability company under the laws of Idaho and is located in Rexburg, Idaho.

18  During the Class Period, Raybould Brothers Farms participated in the supply-restriction

19  and price-fixing scheme as alleged herein.

20  113.    Raybould Brothers Farms grows and sells fresh potatoes.

21  114.    Raybould Brothers Farms is a founding member of UPGI, and Jeff Raybould of

22  Raybould Brothers Farms is an original incorporator of UPGA.

23  **RD Offutt Co.**

24  115.    Defendant RD Offutt Co. ("RD Offutt") is a subsidiary of RDO Holdings Co., a

25  corporation organized, existing, and doing business under the laws of North Dakota with

26  offices and its principal place of business located in Fargo, North Dakota. During the

27
                                                    -21-

28  CLASS ACTION COMPLAINT

1    Class Period, RD Offutt participated in the supply-restriction and price-fixing scheme as

2    alleged herein.

3    116.     RD Offutt has approximately 160,000 acres of farming operations across eight

4    states and is one of the nation's largest producers of potatoes with approximately 60,000

5    acres devoted to potatoes.

6    117.     RD Offutt, one of the world's largest potato growers, sent representatives to the

7    initial meetings establishing the UPGI and participated in the group's price-fixing efforts.

8    118. In 2007, R.D. Offutt partnered with Defendant United II to create the joint venture

9    North American Foods LLC (now known as Idahoan Foods, LLC), contributing potato

10    processing plants in several states. This joint venture enabled potato growers to offload

11    surplus potatoes and further reduce supplies and thereby further facilitated and

12    contributed to the pricefixing scheme alleged herein.

13    **III. Non Grower Co-Conspirators**

14    **Idahoan Foods, LLC (f/k/a North American Foods, LLC)**

15    119.     Defendant Idahoan Foods, LLC (formerly known as North American Foods, LLC,

16    referred to herein as "Idahoan Foods") is a limited liability company organized, existing,

17    and doing business under the laws of Delaware with offices and its principal place of

18    business located in Grand Forks, North Dakota. During the Class Period, North American

19    Foods participated in the supply-restriction and price-fixing scheme as alleged herein.

20    120.     North American Foods is a joint venture between Defendants RD Offutt, a potato

21    grower and processor, and United II, a co-operative of potato growers. It manufactures

22    mashedpotato products and dehydrated products.

23    121.     Wada Farms is one of the grower/owners involved in this joint venture that

24    supplies potatoes to Idahoan.

25    122.     North American Foods was formed "to create a broad network of potato

26    processing plants with convenient access to markets and to customers."

27

CLASS ACTION COMPLAINT

28

123.    As one of the largest potato dehydrators in the country, North American Foods enables its United II grower-owners to divert surplus potatoes to a dehydration operation while profiting from vertical integration.

124.    Through its United II/North American Foods joint venture, UPGI has devised an admitted means of furthering its supply-reduction and price-fixing efforts.

125.    In shutting down potato processing plants as part of this joint venture, Paul Noah, an RD Offutt official in Fargo, North Dakota, stated that "[i]n essence, there is excess capacity in the industry."

126.    On its website, Idahoan Foods states "'[w]ith the formation of Idahoan Foods, we are able to provide a consistent supply of quality raw materials with leading manufacturers of premium potato products,'" said Gordon Lewis, president and chief executive officer of Idahoan Foods as of its formation. 'The combining of resources creates a larger company that will operate more efficiently in today's marketplace.'"

127.    The website further notes, "Combining a full-service network of professionals from field to shelf, Idahoan Foods, LLC is a leading manufacturer of value-added products, its potato processing plants and nationally recognized retail, foodservice, and warehouse club brands of products -- Idahoan, Paradise Valley, and Creamy Mash -- along with its close relationship with the grower cooperative, allow Idahoan Foods to deliver superior quality and value to its customers."

**Bayer CropScience LLC**

128.    Defendant Bayer CropScience LLC ("Bayer CropScience") is a corporation organized, existing, and doing business under the laws of North Carolina with offices and its principal place of business located in North Carolina.

129.    In 2008, Bayer CropScience became a "sponsor" of UPGA's United Potato Partners program. That sponsorship continued in 2009 and 2010. In 2010, Lee Frankel, the CEO of UPGA, described the partnership with Bayer CropScience as follows:

-23-

CLASS ACTION COMPLAINT

1   This continued effort with Bayer CropScience represents the best in a working relationship
2   between potato growers and an agriculture corporation," said Lee Frankel, UPGA president and
3   chief executive officer. "For Bayer, the partnership fosters unique insights into the
4   production needs of potato growers. For growers, the partnership offers invaluable insights into
5   the global factors that influence their markets. Above all, Bayer CropScience's involvement in
6   United helps our organization innovate and obtain the most up-to-date and accurate
7   supply and demand data possible which then allows growers to grow and market their crops more
8   successfully.

9   130.    Bayer CropScience is the primary sponsor of UPGA's United Potato Partners
10  program, which is described on UPGA's website as supporting "the underwriting of
11  United's databases, administration and educational seminars. The seminars provide a
12  means for direct, two-way communication with potato growers."

13  131.    Bayer CropScience's participation in and funding of the United Potato Partner
14  Program, enables UPGA to "offset" the cost to growers of UPGA's data-gathering and
15  pricefixing efforts. UPGA literature explains that this funding partnership arises out of
16  the "common objective" among UPGA, its growers, and its corporate vendors: "The
17  objective that a potato grower has in common with each vendor is that each party wishes
18  to survive and thrive in the potato business."

19  132.    Bayer CropScience, as the UPGA's primary United Potato Partner and attendee at
20  many meetings, was aware of, endorsed, participated in, and profited from the supply-
21  reduction price-fixing scheme alleged herein by providing funds to UPGA to assist its
22  supply restriction efforts in order to gain exclusive access to potato growers to sell Bayer
23  CropScience products.

24  133.    All Defendants are collectively referred to herein as "Defendants." Whenever in
25  this Complaint reference is made to any act, deed, or transaction of the Defendants, the
26  allegation

27                                          -24-
    CLASS ACTION COMPLAINT
28

1   means that the Defendants engaged in the act, deed or transaction by or through their

2   officers, directors, agents, employees or representatives while they were actively engaged

3   in the management, direction, control or transaction of Defendants' business or affairs.

4   **CO-CONSPIRATORS**

5   134.    Various other persons, firms, corporations and entities have participated as

6   unnamed co-conspirators with Defendants in the violations and conspiracy alleged

7   herein. In order to engage in the offenses charged and violations alleged herein, these co-

8   conspirators have performed acts and made statements in furtherance of the antitrust

9   violations alleged herein.

10  135.    At all relevant times, each co-conspirator was an agent of Defendants and each of

11  the remaining co-conspirators, in performing the acts alleged herein, was acting within

12  the course and scope of such agency. Defendants and each co-conspirator ratified and/or

13  authorized the wrongful acts of Defendants and each of the other co-conspirators.

14  Defendants and the coconspirators, and each of them, are participants as aiders and

15  abettors in the improper acts and transactions that are the subject of this action.

16  136.    The business activities of Defendants that are the subject of this action were

17  within the flow of, and substantially affected, interstate trade and commerce.

18  **INTERSTATE TRADE AND COMMERCE**

19  137.    During the Class Period, Defendants transacted business in multiple states in a

20  continuous and uninterrupted flow of interstate commerce throughout the United States.

21  **CLASS ACTION ALLEGATIONS**

22  138.    Plaintiff brings this action under Federal Rule of Civil Procedure 23(b)(2) and

23  23(b)(3) on its own behalf and on behalf of the following class (the "Class"):

24  
25  
26  
27  

> All persons residing in the United States who, at any time from
> **June 18, 2006** through the present, indirectly purchased fresh or
> process potatoes from Defendants or their Co-Conspirators. The
> Class excludes the Defendants, co-conspirators (members of any
> UPGA-affiliated cooperative), and any of their subsidiaries or

CLASS ACTION COMPLAINT

28

affiliates. The Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

139.   Plaintiff does not know the exact number of Class members because that information is in the exclusive control of Defendants. However, due to the nature of the trade and commerce involved, Plaintiff believes that the Class members number in at least the thousands and are so geographically diverse that joinder of all Class members is impracticable.

140.   There are questions of law and fact common to the Class, including but not limited to the following:

a. whether Defendants and their co-conspirators engaged in or entered into a contract, combination or conspiracy among themselves to fix, maintain, raise and/or stabilize the prices of potatoes sold in the United States;

b. whether Defendants' unlawful conduct has enabled them to increase, raise, maintain, or stabilize above competitive levels the prices for potatoes sold in the United States;

c. the duration of the contract, combination, or conspiracy alleged herein;

d. whether Defendants violated Section 1 of the Sherman Act;

e. whether Defendants' actions are exempt from application of the antitrust laws under the Capper-Volstead Act;

f. whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiff and Class members;

g. the appropriate measure of damages sustained by Plaintiff and Class members;

h. whether injunctive relief is appropriate; and

i. if injunctive relief is appropriate, what types of such relief are suitable in this matter.

-26-

CLASS ACTION COMPLAINT

1   141.    These common questions and others predominate over questions, if any, that

2   affect only individual Class members.

3   142.    Plaintiff's claims are typical of, and not antagonistic to, the claims of the other

4   Class members. By advancing its claims, Plaintiff will also advance the claims of all

5   Class members, because Defendants participated in activities that caused all Class

6   members to suffer similar injuries.

7   143.    Plaintiff and its counsel will fairly and adequately protect the interests of absent

8   Class members. There are no material conflicts between Plaintiff's claims and those of

9   absent Class members that would make class certification inappropriate. Counsel for

10  Plaintiff are highly experienced in complex class action litigation, including antitrust

11  litigation, and will vigorously assert Plaintiff's claims and those of absent Class

12  members.

13  144.    Defendants have acted or refused to act on grounds generally applicable to the

14  Class, thereby making appropriate final injunctive relief or corresponding declaratory

15  relief with respect to the Class as a whole.

16  145.    class action is superior to other methods for the fair and efficient resolution of

17  this controversy. The class action device presents fewer management difficulties, and

18  provides the benefit of a single adjudication, economy of scale, and comprehensive

19  supervision by a single court. The damages suffered by Plaintiff and each Class member

20  are relatively small as compared to the expense and burden of individual prosecution of

21  the claims asserted in this litigation. Thus, absent class certification, it would not be

22  feasible for Plaintiff and Class members to redress the wrongs done to them. It also

23  would be grossly inefficient for the judicial system to preside over large numbers of

24  individual cases. Further, individual litigation presents the potential for inconsistent or

25  contradictory judgments and would greatly magnify the delay

26  and expense to all parties and to the judicial system.

27                                          -27-

CLASS ACTION COMPLAINT

28

1  **FACTUAL ALLEGATIONS**

2  **The Potatoes Market**

3  146.    Potatoes are the most important vegetable in the diet of United States consumers.

4  During the last twenty years, potatoes were ranked as the second most important product

5  in United States food consumption following wheat flour.

6  147.    Potato consumption can be divided into four general categories:

7  a. Table stock (also known as fresh potatoes) includes numerous varieties such

8  as round white, round red, russet and Irish potatoes;

9  b. Potatoes for processing includes chips and shoestring, dehydrated, frozen

10  (french fries and other forms such as patties), canned, starches and flours;

11  c. Other sales including seed and feed for livestock; and

12  d. Non-sale uses such as shrink, loss and on-farm uses such as feed and seed.

13  148.    Sweet potatoes and yams are separate products and are not included in the

14  definition of fresh or process potatoes herein.

15  149.    The United States potato industry is a multi-billion dollar annual market. For

16  example, in 2007, the United States potato market had a total production of 449 million

17  cwt (hundredweight or 100 pounds) of potatoes and the value of production was $3.2

18  billion dollars.

19  150.    In 2008, total domestic potato production was 415 million cwt, approximately 7

20  percent below the 2007 crop levels (due to the supply reduction price-fixing scheme

21  alleged herein). Despite the reduced production, however, overall market value of

22  production was $3.49 billion—an increase of 13 percent over 2007 production values.

23  151.    Potatoes are grown primarily in the Western and Northern regions of the United

24  States.  Potato crops are generally planted in the spring and harvested in the fall (these are

25  known

26

27                                                      -28-

CLASS ACTION COMPLAINT

28

as "fall potatoes"), although potatoes are also harvested in the other seasons depending on where they are grown.

152.    Because of good storage technology and practices, the marketing season for fall potatoes extends from July (early harvest areas) through June of the following year.

153.    Idaho and Washington are the two largest potato-producing states (growing mostly "fall potatoes"), accounting for over half of United States production. North Dakota, Colorado, Wisconsin, Oregon, Maine and Minnesota accounted for another 30 percent of U.S. production, with 23 other states accounting for the remaining 19 percent.

154.    California, Florida and Texas lead production of winter, spring, and summer potatoes. These potatoes have a smaller share in the total potato market, but satisfy specific needs for the fresh and process markets.

155.    Fresh potatoes are usually sold in the open market and processing potatoes are typically sold through contracts. Processing potato contracts are usually signed prior to the planting season and specify a potato variety, quantity, and base price with incentives based on quality requirements.

156.    The fresh and process potato markets are interconnected. According to Defendants, one of the problems contributing to excess potato supply was process growers planting acres of potatoes not under contract to sell on the open market. Thus, it was crucial to fresh potato growers to get process potato growers to agree to the price fixing conspiracy, as well. Defendants' price fixing scheme, as alleged herein, was designed to and did fix, raise, maintain, and/or stabilize prices for both fresh potatoes and potatoes sold for processing.

157.    Potatoes can be readily stored and transported, making it possible to market them to both the fresh and processed market. The fresh market generally commands the highest price.

-29-
CLASS ACTION COMPLAINT

1   Nearly two-thirds of potatoes were used for processing in 2008, with frozen french fries

2   and other frozen potato forms being the largest segment. Table stock accounted for 28%

3   of use and the remainder went to feed, seed and other uses.

4   158.   Many fresh potato growers (such as several of the Defendants herein) are

5   vertically integrated and handle growing, packing, shipping, and even further processing

6   on the farm. Many of the large potato growers also act as packing and shipping

7   operations for other growers.

8   159.   Packing sheds generally work in conjunction with growers to wash, grade, and

9   pack potatoes to be shipped to direct purchasers such as retailers and distributors.

10   160.   While potatoes were the single most-consumed vegetable in the United States in

11   2007, consumption in total pounds and as a percentage of total vegetables consumed have

12   been declining since 2001. Average yearly potato consumption per person was 138.8

13   pounds in 2001, had declined to 126.0 pounds in 2007 and was forecasted to further

14   decline to 125.3 pounds in 2008. Potatoes were 31.4 % of all vegetables consumed in

15   2001 and were only 28.4 % in 2007. The decline was true for both fresh potatoes and

16   potatoes for processing, although the decline was greater for fresh potatoes. Fresh potato

17   consumption declined almost 16% from 2001 to 2007 while potatoes for processing

18   declined nearly 6% over the same time period.

19   161.   Despite declining demand, potato demand is highly price inelastic. A 1%

20   decrease in fresh potato supply can cause up to a 7% increase in price due to a lack of

21   suitable alternatives.

22   **I. The History and Operation of the Potato Cartel**

23   162.   In response to declining prices, Idaho potato growers (who produce

24   approximately one-third of the potatoes in the United States) grew concerned about their

25   profits

26

27

CLASS ACTION COMPLAINT

28

1  in the early 2000s. In 2003, several Idaho growers agreed to implement acreage

2  reductions in order to reduce supplies. Given the limited success of these schemes,

3  however, one of the largest potato growers in the country, Defendant Albert Wada,

4  decided to form an Idaho "cooperative" with other Idaho growers in order to formalize a

5  joint agreement among his competitors to reduce potato supply and fix, raise, maintain

6  and/or stabilize prices.

7  163.    Mr. Wada began realizing his expressed intent of "managing North American

8  potato supply" by first seeking to organize Idaho potato growers. In late 2004, along with

9  other Idaho potato growers, Mr. Wada co-founded United Fresh Potato Growers of Idaho

10  ("UFPGI"), later renamed UPGI. Mr. Wada hoped UPGI would serve as a nucleus for an

11  even larger, nationwide "cooperative" with member co-ops in each potato-producing

12  state.

13  164.    Mr. Wada called his potato price-fixing plan, "United We Stand" and openly

14  discussed how he wanted to "unite" potato growers, "decrease competition," and

15  "rationalize the industry" by collectively curtailing production. UPGA's website makes a

16  similar point: "[i]n 2004, after evaluating the economic realities of the current business

17  climate, a group of potato growers decided that long-term production and supply

18  management are critically needed to provide stability and a reasonable return for

19  growers."

20  165.    In published articles about this plan, Mr. Wada acknowledged that his activities

21  might be subject to antitrust laws. The attorney for UPGI and UPGA, Randon Wilson,

22  also discussed the fact that the Idaho cooperative (and later the nationwide cooperative)

23  would have to conform to the Capper-Volstead Act and that packers and other ineligible

24  businesses could not participate in the cooperative or their supply reduction schemes. Mr.

25  Wilson is quoted in nonprivileged, public articles as saying that in order to receive

26  protection under the Capper-Volstead Act, "[w]e've got to be a pure farmer's

27

-31-

CLASS ACTION COMPLAINT

28

1  cooperative" and packers and other ineligible business could not be involved in the

2  cooperative.

3  166.    As discussed herein, this advice was not followed. Numerous non-grower entities

4  and growers that also were packers were involved with Defendants' price fixing scheme.

5  For example, Wada Farms' own website notes: "Wada Farms is among the largest

6  growers **and packers** in the industry." (Emphasis added.) Thus, UPGI and UPGA have

7  no protection under the Capper-Volstead Act.

8  167.    The potato cartel was first formalized when Mr. Wada organized a meeting of

9  Idaho potato farmers in September of 2004 to discuss how to "curb production" and

10  "boost prices" for potatoes. At this meeting, Mr. Wada and Keith Cornelison (of

11  Defendant Cornelison Farms) summoned 23 Idaho potato growers to an office in

12  Blackfoot, Idaho to discuss how their collective efforts at reducing potato supplies would

13  help fix, raise, maintain, and stabilize prices.

14  168.    After more meetings, phone calls, and emails among these growers, the group

15  agreed to form UPGI - with the explicit goal of reducing potato supplies through various

16  means.

17  169.    The 23 growers in attendance at this meeting became the founders of UPGI,

18  which filed for incorporation on November 2, 2004. The founders' operations

19  encompassed approximately 60 percent of the fresh potatoes produced in Idaho and 25

20  percent of the fresh potato market in the United States.

21  170.    The individuals at the initial UPGI meeting who explicitly signed on to the supply

22  reduction and price-fixing scheme alleged herein included: Blaine Larsen (of Defendant

23  Larsen Farms), Albert Wada (of Defendant Wada Farms), and Defendant Michael

24  Cranney (of Cranney Farms)—the three largest growers in Idaho and among the biggest

25  in the US. Other Idaho-based growers at this meeting who became founders of UPGI and

26  signed on to the price-fixing and capacity reduction scheme, some of whom are named as

27

-32-

CLASS ACTION COMPLAINT

28

Defendants herein, include Keith Cornelison (of Defendant Cornelison Farms), David Beesley (of Defendant Snake River Plains Potatoes), George Crapo (of Crapo Farms, Inc.), Mark Cummins (of Cummins Farms/Cummins Family Produce), Loraine Driscoll (of Defendant Driscoll Potatoes), Jeff Duffin (of Duffin Potato Company), Paul Duncan and Defendant Lance Funk (of Lance Funk Farms), Gary Hansen (of Hansen Farms), Dale Mickelson (of Defendant Rigby Produce), Ron Olsen (of Murdock Farms), Jeff Raybould (of Defendant Raybould Brothers Farms), Carl Taylor (of Howard Taylor & Sons), Kim Wahlen (of Defendant Pleasant Valley Potato), Blair Walker, Dick Watt (of Sunspiced Grower Cooperative) , Lynn Wilcox (of Floyd Wilcox & Sons), Clint Young, and Roy Young.

171.    In the Articles of Incorporation of UPGI, the stated purpose of the organization is "to stabilize potato prices and supplies in the State of Idaho and to work with similar cooperatives in other states having similar purposes."

172.    In October of 2004, the UPGI founders issued a press release discussing their goals of "supply management" principles and asked other potato growers from around the country to attend another meeting to discuss the formation of additional regional and national groups to assist in their price-fixing efforts. The next cartel price-fixing meeting occurred on November 3, 2004, at 10:00 a.m. at the Shiloh Inn Convention Center in Idaho Falls, Idaho—the day after UPGI's articles of incorporation were filed.

173.    Growers from Colorado, Oregon, Washington, Wisconsin, and California joined the Idaho potato farmers at the meeting. The meeting was closed to the media. At the meeting, Mr. Wada announced the group's price-fixing plans to several hundred potato farmers, which prompted a standing ovation. Many farmers signed on to the supply reduction agreement on the spot agreeing to pay annual dues ranging from about $10,000 to $500,000 depending on how much acreage each farmer utilized for growing potatoes. Defendant RD Offutt Co., one of the world's largest potato growers, sent a representative

-33-

CLASS ACTION COMPLAINT

1    to this meeting and the company subsequently agreed to the price-fixing scheme alleged

2    herein, as well, and participated in a joint venture to further aid the potato supply

3    reduction efforts.

4    174.    On December 2, 2004, the 23 founding members of UPGI, all of whom had

5    signed on to the supply management scheme, voted to move the commitment date to join

6    the coop to January 17, 2005—two weeks ahead of the original membership deadline. At

7    this point, the group already had 80 percent of all acres dedicated to fresh potatoes in

8    Idaho committed to supply reductions under its membership agreements. By February of

9    2005, UPGI was colluding with owners of 91% of the fresh potato grower acreage in

10   Idaho through various means.

11   175.    The fresh potato market is strongly affected by the processing potato and seed

12   potato markets as they are all interrelated. Cooperation with the process and seed potato

13   growers was crucial for UPGI's success. Thus, UPGI sought out groups of process and

14   seed growers to sign on its anticompetitive scheme.

15   176.    As of December of 2004, UPGI had negotiated "Memorandums of

16   Understanding" ("MOU") with the directors of every potato grower group in Idaho,

17   including Potato Growers of Idaho ("PGI"), Potato Management Company ("PMC"),

18   Seed Potato Growers of Idaho ("SPGI"), and the Southern Idaho Potato Cooperative

19   ("SIPCO"). SPGI and SIPCO later joined UPGI as independent districts.

20   177.    PGI was formed in 1968 to serve as a bargaining unit for growers in contract

21   negotiations with potato processing companies. In the more than 30 years since its

22   organization, PGI's mission has evolved to include representation of growers with

23   governmental, legislative and industry organizations. In 2000, PGI membership opted to

24   end its role as a contract negotiator, and to focus its efforts more fully on its information

25   and representation missions.

26   178.    PMC was formed in 2000 by a group of Idaho potato growers and shippers to help

27

-34-

28   CLASS ACTION COMPLAINT

1    reduce potato supplies. The group was successful in organizing various programs,

2    including charitable donations and cattle feeding, that removed several million

3    hundredweight of potatoes from the market. In addition, the group donated over 15

4    million pounds of potatoes to help reduce domestic supply.

5    179.    SIPCO, was founded in 1997 and acts as the bargaining unit for Idaho frozen

6    process growers. SIPCO also negotiates annual contracts with Idaho and Oregon

7    processors with the goal of providing a stable and reasonable rate of return for the Idaho

8    frozen process grower.

9    180.    SPGI was a group of seed potato growers. Seed potatoes are produced to be used

10   for planting new crops of potatoes. Once cut into sets and planted, seed potatoes grow

11   into tablestock potato varieties. Seed potatoes themselves are not intended for human

12   consumption.

13   181.    These groups were not "Capper-Volstead cooperatives," yet UPGI collaborated

14   and conspired with them to reduce potato supplies. Through the cooperation insured by

15   these MOUs, the growers, shippers, and other entities working collectively with UPGI to

16   reduce potato supplies accounted for more than 60 percent of *all* Idaho potato acres (and

17   not just the vast majority of those devoted solely to fresh potato production).

18   182.    In December of 2004, as part of these coordinated agreements, PGI (a

19   noncooperative) issued a statement in its newsletter stating that "supply is manageable

20   but the key to making it so lies in a united and concerted effort to manage supply." PGI

21   re-emphasized that it is in the best interests of all growers to unite in working out a plan

22   to manage supply and spread the responsibility. PGI and UPGI also issued joint

23   newsletters espousing the need to collectively reduce supply.

24   183.    To achieve its supply reduction objectives, the UPGI developed and started

25   enforcing a set of programs and policies that targeted both production and marketing of

26   fresh potatoes. The level of potato production was controlled through the implementation

27
                                                              -35-
     CLASS ACTION COMPLAINT
28

of two policies. First, before the beginning of a planting season, the potato production was controlled by enforcing an acreage management program, which was implemented through a bid buy down program. Secondly, during the potato growing season, before harvest, the production was monitored over time and accurate yield predictions were made; this was implemented through a series of field digs.

184.    The UPGI's marketing programs also included coordination of potato shipments throughout a marketing year, providing marketing information to potato growers and implementation of secondary market strategies. UPGI also sought to remove excess potatoes by identifying new market opportunities such as donating potatoes to charities.

185.    UPGI initially studied and implemented many different methods to reduce potato supply. UPGI's first supply control efforts involved using a price floor by analyzing market information and setting floors for the main fresh pack products. The price floors were eventually abandoned. UPGI also considered making grade standards more stringent because diverting smaller potatoes into processing would also reduce fresh potato supplies and boost market prices.

186.    A short time later, UPGI also employed another supply management tool— "shipping holidays." The UPGI marketing committee would review market information, including data from each member's packing operation. Each week they would decide if a "shipping holiday" would be imposed. If a "shipping holiday" was put in place, each potato packing operation would shut down for at least one eight-hour shift in order to further reduce supplies and increase prices.

187.    UPGI realized that its most effective method of controlling supply would be to manage the production of the next year's potato crop through acreage reductions.

188.    UPGI's first year acreage management program was implemented in spring 2005. The number of planted fresh potato acres for the fall 2005 crop was reduced by approximately 15% (26,000 acres) relative to the 2004 year acreage base against which

-36-

CLASS ACTION COMPLAINT

the reduction was measured. The program proceeded in two phases. First, a group of the

largest potato growers reduced their planted area by 11,000 acres (15% on average).

Secondly, the first ever bid buydown program was implemented. Potato growers were

submitting bids on how much they needed to be compensated in order not to plant, and

UPGI accepted the best (*i.e.*, lowest) bids, thus resulting in further acreage reductions.

189.    UPGI also executed a secondary market strategy at the beginning of 2005 that

removed approximately 8% of potato stock from the market. A surplus from the 2004 fall

crop was diverted to charities and food banks. For example, in January 2005, UPGI

donated 40,000 pounds of potatoes to food banks for the expressly stated purpose of

reducing potato supplies.

190.    Furthermore, the first ever Idaho marketing conference calls were implemented.

The calls took place twice a week at the state level (and were later established as once a

week at the national level with the formation of UPGA). Prior to a conference call,

participating warehouses would log on the UPGI web-page and provide information on

capacity, stocks and pack-outs. These data, along with other information (prices, trends,

weather, etc.), were discussed during the conference call, and were summarized as a

marketing summary posted on the internet to assist with "flow control" and prevent

potatoes from being shipped when prices were too low.

191.    With the understanding that these supply management techniques would need to

be undertaken on more than just a regional level, UPGI used UPGA and the other

coconspirators to institute its supply-restriction techniques on a much broader,

nationwide scale. Mr. Wada and his co-conspirators nationalized (and internationalized)

their potato supplyrestriction efforts and assisted in forming other regional and national

potato cooperatives with this goal in mind.

192.    In December of 2004, UPGI met with growers in Colorado and Wisconsin to aid

-37-

CLASS ACTION COMPLAINT

in the formation of United Fresh Potato Grower groups in those states as well. Oregon growers in Klamath basin formed another group in that state too. In February 2005, Washington growers also met to coordinate supply restrictions. Regional potato grower cooperatives were later formed in Central California, and other areas of the Southwest, Midwest, and West. As UPGA's website states, "Idaho leaders reach[ed] out to growers in other regions and invite[d] them to form their own supply-management cooperatives as part of the united effort. Soon, regional coops [were] formed in Colorado, Klamath basin (on the border of California and Oregon), Washington-Oregon, and Wisconsin. (Later, growers in central California, the Southwest, Midwest and West form[ed] co-ops.)"

193.    These regional cooperatives then met to form a national group, under the leadership of Albert Wada, that could coordinate the supply restrictions discussed herein across the country and North America.

194.    The original incorporators of UPGA include: Albert Wada (of Defendant Wada Farms); Loraine Driscoll (of Defendant Driscoll Potatoes); and Jeff Raybould (of Defendant Raybould Brothers Farms). The initial Board of Directors were Tony Amstad (of Amstad Produce Inc. in Oregon); Warren Boegel (of Boegel Farms in Kansas); Defendant Michael Cranney (of Cranney Farms in Idaho); Dennis Day (of Montana); Allen Floyd (of Harvest Fresh Produce in Washington); Tom Franconi (of Kern Produce Shippers in California); Dick Okray (of Okray Farms in Wisconsin); Ed Staunton (of Staunton Farms in California); Dave Warsh (of Warsh Farm in Colorado).

195.    According to the UPGA website,"[r]ealizing the need for national coordination, communication, data gathering and analysis, professional leadership and staff to handle the many facets and programs of the organization, United Potato Growers of America [was] formed" in March 2005. The national cooperative facilitated the nationwide supply-restriction campaign through its regional cooperative members (which were in turn made up of individual growers who implemented the actual supply reductions).

-38-

CLASS ACTION COMPLAINT

196.    UPGA nationalized the regional supply-restriction scheme initially developed by UPGI. The UPGA's mission statement read: "[w]e bring order and stability to the North American potato growing industry and increase our member potato growers' economic potential by the effective use of cooperative principles."

197.    The management structure of UPGA is depicted in this graphic from its website, which includes a distinct "Supply/Demand Committee":

198.    UPGA's supply control efforts are further confirmed by the mission statements on its own website: "Vision: We will manage national potato supply so as to positively affect grower profitability."

199.    The UPGA's key initiatives are listed as:

> United Potato Growers of America implements strategic supply management programs. Key priorities include providing planting guidelines based on sound data and historical facts; acreage verification programs; information sharing; developing strategic alliances; managing supplies; and improving grower return on investment.

200.    In a Frequently Asked Questions ("FAQ") section that used to appear on its website (but which UPGA has now removed), UPGA detailed its goals regarding supply reduction, its mechanisms for implementing supply reduction, the effectiveness of its supply reduction scheme, and other details of its operations as follows:

By joining United Potato Growers of America, you can help bring stability to the industry. A stable industry is good for your operation and for the entire industry. UPGA provides the infrastructure so that growers across the country can share information, evaluate and analyze the market,

-39-

CLASS ACTION COMPLAINT

1   and better communicate and cooperate for the good of all. By working together, we can

2   manage supply to meet demand, and influence the market to foster a reasonable return for

3   the grower. UPGA has many programs that help growers work collaboratively

4   to match supply to demand.

5   **UPGA has many initiatives and programs in place to manage**

6   **supply. Acre buy-down is one of our programs. In most**

7   **cases, acreage buy down is funded by payments from growers**

8   **who do not achieve their acreage reduction targets. Each**

9   **member co-op decides its level of involvement.**

10   . . .

11   **Our efforts are targeted at supply management in order to**

12   **help growers receive a reasonable price for their crop.**

13   (Emphasis added.)

14   201.    In April of 2005, UPGA announced the first nationwide acreage buy-down

15   program in the history of United States potato production to its members. As with

16   UPGI's acreage reduction efforts, grower members were allowed to "bid" acres into the

17   buy-down program if they agreed to plant less acreage than they did in 2004. UPGA

18   member funds would then be used to compensate those growers who agreed to plant less.

19   Similar programs and acreage reductions have continued to present.

20   202.    Regarding this acreage buy-down program, Albert Wada is quoted as saying:

21   "This is a great opportunity to bring stability and rationale to our Potato Industry…

22   Through cooperation and unity we can and will help ourselves and each other achieve our

23   goals. We strongly encourage all growers to take advantage of this offer while it is

24   available and join their state or regional cooperative and the United of America Board to

25   reduce 2005 acres."

26   203.    In April of 2005, Mr. Wada also traveled to Prince Edward Island in Canada to

27   -40-

28   CLASS ACTION COMPLAINT

facilitate the formation and operation of a North American-wide potato cartel that would reduce potato supplies and fix potato prices across the continent. The entire UPGA Board of Directors met with Canadian growers in Charlottetown, Prince Edward Island, in June 2005. More than 250 growers attended this meeting, preliminarily approved starting a Canadian counterpart to the UPGA, and voted to cap island potato acreage for each grower. As a result of this meeting and as discussed further *infra*, Canadian growers formed the UPGC, which, as reflected in the organization chart set forth previously, became a part of the UPGA.

204.    In June of 2005, UPGA announced that its first acreage buy-down program had been a success. Members collectively agreed to cut their crop by tens of thousands of acres to their lowest levels since 1959. Preliminary estimates showed United States potato acreage down 35,000 acres as a direct result of the UPGA's buy-down program.

205.    The impact of the UPGA program was also noted at the national level. The average potato price was approximately 23 percent higher in 2005 relative to 2004. The United States Department of Agriculture ("USDA") noted that this was due to the bid-buy program instituted by UPGA, which removed from the market almost 11% of fresh potato production in 2005.

206.    UPGA's officers confirmed the success of their efforts. Jerry Wright, the former CEO of UPGA, was quoted as saying that "due primarily to [UPGA's] three-phase supply management program implemented nationwide, growers have the highest returns ever for this time of the year.... The success of the whole program is the result of the growers' determination to solve their own problems and manage their supply."

207.    On November 16-17, 2005, Idaho growers met to discuss 2006 crop reduction guidelines at the Red Lion Inn in Pocatello, Idaho. Joint meetings were also held with the SIPCO, U.S. Potato Board, and the Potato Marketing Company. At these meetings, UPGI

-41-

CLASS ACTION COMPLAINT

1  members (including Defendant growers herein) and other Idaho growers agreed to plant

2  10% less than their 2004 base acres.

3  208.    UPGA's January 2006 newsletter announced the group's national 2006 crop

4  reduction efforts following the Idaho growers' agreement to reduce plantings by 10%

5  from 2004 acres. Members not agreeing to reduce plantings by 10% were required to pay

6  a $50 per acre assessment. Those growers that agreed to reduce acreage more than 10%

7  were allowed to put their acres into the bid buy-down program for extra compensation.

8  209.    UPGI and UPGA also coordinated potato flow control throughout the marketing

9  year in order to control the quantity of potatoes supplied to the market throughout a

10 marketing year when prices were low.

11 210.    In Idaho, warehouses participating in the "flow control" program represented

12 more than 75% of Idaho's potato packing capacity. Personnel at warehouses entered

13 information on the capacity, stocks and pack-outs on the UPGI webpage on a regular

14 basis. After weekly telephone conversations, price advisory information was then posted

15 on the internet for members and non-members which was then used as the pricing

16 strategy for the coming week.

17 211.    In a 2006 PowerPoint presentation prepared by Albert Wada for UPGA members

18 titled "The North American Potato Cooperative Movement," Mr. Wada detailed strong

19 encouragement for members to stay committed to the supply-restriction efforts. Slides

20 included the following:

21     • UNITED = GROWER PROFITABILITY - The UNITED

22     cooperative is gaining the grower critical mass to be able to

23     EFFECTIVELY manage supply in order to attain fair pricing

24     • UNITED's System Will Work! - UNITED's programs have

25     helped to increase open market fresh table grower returns for the

26     '05 crop by multiple times '04 crop pricing - Process grower

27                                          -42-

28  CLASS ACTION COMPLAINT

markets are stronger - Econ. 101: The only effective method for

influencing price is to manage the supply!

• The law of ECONOMICS will always win and growers will lose

if production and supplies are not managed

• UNITED'S STRATEGY? THE WHOLE PILE OF POTATOES

HAS TO BE MANAGED!

• Cooperative growers must create orderly markets and grow the

category……instead of fighting for a piece of it by zero-sum

competition!

212.    In published articles, Mr. Wada confirmed that the purpose of UPGA was to

reduce supply and raise prices:

[Wada] said the major benefit of the association is

communication. Sharing supply management data across a broad

growing region has allowed the organization to raise prices by

better matching potato supplies with demand.

"We're talking to one another," Wada said. He described the

industry's oversupply and poor profitability as "an albatross

hanging around our necks for years."

. . . .

**"Without supply management and grower solidarity, we don't**

**have adequate profit margins," Wada added. "Growers tend**

**to think it is a sin to produce a profit. Potato growers are very**

**independent and the one thing that they can do is**

**independently go broke."** (Emphasis added.)

213.    In another interview, Albert Wada asserted that UPGA had "worked with

-43-

CLASS ACTION COMPLAINT

1    members to eliminate the potato glut by things like reducing the amount of potatoes

2    planted and pledging not to send potatoes to market in the event of oversupply."

3    214.    In addition to acreage buy-downs, UPGA also touted its "flow control" efforts to

4    keep potatoes from entering the market. Buzz Shahan, former COO of UPGA, stated that

5    "[y]ou can't enter all of those potatoes into the market in one day. So we monitor the

6    flow of product into the market on a weekly basis and adjust the flow so that we don't

7    create a periodic glut."

8    215.    An August 2007 article in *High Country News* entitled "The Sultans of Spuds -

9    Battered by their own success, farmers form the 'OPEC of Potatoes'" described the

10   meetings of UPGA and this "potato cartel" as follows:

11   Once a month, usually on a Wednesday morning, about a dozen

12   men arrive at the Salt Lake City airport on separate flights from

13   around the country. They are whisked into waiting cars for the

14   five-minute trip to a glass fronted office building nearby. There,

15   in an unpretentious conference room, they meet several more of

16   their associates.

17   **These men are the leaders of a little-known international**

18   **cartel, and at meetings such as these, they fine-tune an**

19   **elaborate system of production targets and quota transfers to**

20   **control the price of the commodity around which their world**

21   **revolves.** It is a serious business, backed up with reconnaissance

22   from satellites orbiting high above the Earth, and **the**

23   **organization's strict code of conduct allows for the use of what**

24   **its members artfully refer to as "punitive measures" against**

25   **anyone who violates the rules.** And, at lunchtime, the men

26   always pause to sample their merchandise. "We always serve

27                                        -44-

28

1   potatoes. We always serve potatoes, whether it's chips or fried or

2   mashed or whipped or salad," says Barb Shelley, one of a small

3   cadre of people who carry out the organization's legwork. Not

4   even lunch, it turns out, is safe from the group's intense scrutiny:

5   "When we order from the caterer, we say, 'These are potato

6   growers. We want your highest quality potatoes. Do not'" -

7   Shelley pauses ominously - "'give us bad quality.'"

8   This may sound like a plot lifted straight out of a Mel Brooks

9   movie, **but the potato cartel is real**. And its existence speaks

10   volumes about the often-perverse dynamics of American

11   agriculture. (Emphasis added.)

12   216.    Mr. Shahan was also quoted in this article as stating that the UPGA's members

13   "are very strong guys that have been kicking people's butts since junior high" and that

14   "to get them in a room and have them discuss market share and things like that, it gets a

15   little Western."

16   217.    An article in the *Wall Street Journal* entitled "This spud's not for you: Co-op of

17   farmers seeks to become OPEC of potatoes" also compared the Defendants' potato

18   supply control conspiracy to that of OPEC: "[i]t took farmer Merrill Hanny three days to

19   bury $100,000 worth of his perfectly good potatoes. He remembers how they crunched

20   beneath his tractor as he plowed over his muddy field in the spring of last year. Mr.

21   Hanny destroyed part of his crop at the behest of the United Potato Growers of America,

22   a fledgling group of regional farming cooperatives. The group aspires to be to potatoes

23   what OPEC is to oil by carefully managing supply to keep demand high and constant,

24   resulting in a more stable return for farmers."

25   218.    In order to ensure strict compliance with the supply reduction and price-fixing

26   agreement, UPGI and UPGA conducted audits and utilized GPS, aerial photography, and

27                                                    -45-

CLASS ACTION COMPLAINT

28

satellite imaging to verify that co-conspirators had complied with the quotas and not exceeded the potato acreage upon which they agreed to grow.

219.    At the beginning of the planting season, growers filled out the Planting Intention Form. On this form, the grower recorded their 2004 year base acreage and their current year planting intentions by potato variety. The Planting Intention Form was then the grower's commitment against which the grower's actual performance was evaluated.

220.    UPGA also checked farmers' acreage against the paperwork they submitted to the federal Farm Service Agency for government-support programs. The documents used to assess the actual acreage grown were the copies of the Farm Service Agency ("FSA") Form 578 (*i.e.* a report of acreage). Growers had to agree to allow UPGA access to these otherwise confidential submissions.

221.    The UPGI's and UPGA's field representatives would review the grower's planting intention commitment, filed maps and FSA Form 578. Then, the representative would conduct inspections of each parcel of land to verify actual plantings and reductions. The results of the audit were then reported to the Future Crop Committee and the UPGI and UPGA Boards.

222.    In 2006, the fields of 25% of the general membership and of 100% of the UPGI Board members were audited, which represented 65% of the UPGI's fresh potato acres. At that audit, all the audited fields were in compliance with supply reduction scheme and bid buy-down programs. The audit confirmed that the audited members of the UPGI reduced the potato acreage by more than 10% relative to the 2004 year base.

223.    Any growers that did "cheat" were subject to punitive measures and fines. For example, the cooperatives' bylaws allowed them to levy fines of $100 per acre against growers who violated the supply reductions.

224.    UPGA argued in its newsletter that its acreage buy-out and reduction program

-46-
CLASS ACTION COMPLAINT

would lead to significant financial returns for growers: "[w]ithout the Acreage Buy-Out program, growers very likely will be looking at GRI's next year that will be $3 to $4 per cwt. lower versus 2005. Please do not forget the lessons of the last few bad years caused by overproduction. With your $50 per acre 'Payment-in-Kind' investment in the acreage reduction plan, we anticipate 2006 GRI's greater than 2005. Per acre, that is more than a 3000% ROI. It is not a gamble; IT IS SMART BUSINESS AND RISK-MANAGEMENT!!"

225.    UPGA was correct; the potato cartel's efforts began to see significant progress in raising prices starting in 2005 (and continuing to present) as the cartel was able to reduce potato supply. Between September of 2005 and June of 2006, potato growers received an average of $6.67 for every 100 pounds of potatoes – a nearly $4 increase from the previous year. By 2007, farmers were averaging $7.75 for every 100 pounds of potatoes.

226.    According to a *Spudman* reader survey in May of 2006 – cited in then-UPGA CEO Julia Cissel's 2006 PowerPoint presentation titled "Managing Supply and Influencing Acreage" – "85% of all respondents said they have seen an increase in their profits since UPGA was formed."

227.    UPGA's and UPGI's potato acreage reductions and subsequent price increases carried on in to 2007, 2008, and to the present.

228.    UPGA and UPGI's 2007-08 United Acreage Reduction Program established the following rules similar to those of the earlier years: Each base potato acre was assessed at $50. A base year relative to which the acreage reduction was calculated was 2004. Members and *nonmembers* willing to participate in the program had two options. The first option was to reduce potato planting area by exactly 15% relative to the 2004 year base. This option was considered to be a payment in kind and the grower would owe no cash. The second option was to reduce potato acreage by less than 15% relative to the

-47-

CLASS ACTION COMPLAINT

1  2004 year base. In this case, the grower was assessed a pro-rated percentage of $50 per

2  acre on all base acres.

3  229.    There were four levels of the pro-rated percentage. For example, if a grower's

4  acreage reduction was between 10% and 14.99%, then the grower paid $20 per base acre;

5  if the acreage reduction was between 5% and 9.99%, then the grower paid $30 per base

6  acre. The collected money was used to "buy out" acres elsewhere. Growers who decided

7  to expand beyond their base were assessed $100 per acre on all acres (expansion plus

8  base acres). This fee was a punitive measure to prevent the "mindless expansion" that

9  UPGI and UPGA considered to be illegitimate and against the mission of supply

10 reduction.

11 230.    Those SIPCO members of UPGI who grew only processing potatoes were

12 allowed to plant only contracted processing potato acres. The UPGI/SIPCO members

13 who grew both fresh and processing potatoes were required to follow the potato planting

14 guidelines for their fresh potato acres and were allowed to plant only contracted

15 processing potato acres.

16 231.    All UPGA and UPGI members (and some non-members) agreed to these

17 programs and reduced supply as a result, or paid assessments to allow others to reduce

18 supply.

19 232.    In 2008, growers following UPGA's plans planted on 80,000 fewer acres than in

20 2007. In Idaho alone, growers reduced acreage from 350,000 to 300,000. In an interview

21 about why farmers were cutting acres, UPGI's CEO, Jerry Wright stated: "[y]ou have the

22 combination of growers having alternative cash crops and they know they have to reduce

23 potato planting to get supply in balance with demand. This is the year they've been able

24 to do it."

25 233.    As a result of these efforts, by the summer of 2008, according to the Idaho Potato

26 Commission, a ten pound bag of potatoes cost consumers $15—up $6 over 2007.

27                                         -48-

28 CLASS ACTION COMPLAINT

234.    A 2008 study by an Agricultural Economics Professor at the University of Idaho confirmed that UPGI's and UPGA's efforts had led to increased prices. The study found that the Idaho monthly fresh potato prices increased from $3.89 per cwt in the pre-coop period to $6.63 per cwt in the coop period, while the US monthly fresh potato prices increased from $7 per cwt. to $10.19 per cwt. The study found that approximately 60% of the price increases were due to reasons other than increased production costs and that the cooperatives' price-fixing efforts were "likely to be the most significant factor explaining the identified price increases."

235.    The study found that "[a]s indicated by the US monthly fresh potato prices, all potato growers received higher prices since 2005, after the acreage management programs started being implemented in several potato growing regions in the country." Furthermore, the authors concluded, "we believe that the [UPGI] and potato growers cooperatives with similar objectives were successful in accomplishing their goals and impacted the fresh potato price level and volatility during the period of 2005-2008, which ultimately benefited all potato growers."

236.    In an article in the December 15, 2008 issue of *Packer Online*, Paul Dolan, General Manager of Associated Potato Growers, Inc., noted that demand was down from 2007 because potato prices were 50% higher than the previous year, a situation he attributed in part to "market unity."

237.    By 2009, potato prices had remained constant or grown for four consecutive growing seasons - something that had never happened in more than a century that USDA has been keeping such records.

238.    On its previous website FAQs, UPGA stated that there was "no doubt" that its numerous efforts to reduce supply had impacted and improved potato prices: "Q. How can you prove that UPGA's efforts to manage supply influenced last year's price? A.

-49-

CLASS ACTION COMPLAINT

1   While many factors influence supply, there is no doubt that UPGA's acreage reduction,

2   acre buy-down, flow-control, and information sharing programs impacted the market."

3   239.   In its 2009 annual report, UPGA presented the following graph that showed how

4   its anticompetitive scheme had inflated the prices for fresh potatoes:

5   240.   With respect to this graph, UPGA said: "[t]he first graph shows total U.S. fresh

6   shipments in bars and the U.S. Grower Return Index as a line. GRI is what a grower

7   received on average after accounting for packing charges. GRI continued to decline from

8   2002-03 to 2004-05. **Once [UPGA] formed it implemented supply management**

9   **programs, and the effect can be seen in the drop in total U.S. Fresh**

10  **Shipments (the bars in the graph) and a corresponding increase in the**

11  **GRI**." (Emphasis added.)

12  241.   UPGA's annual report also discussed how its anticompetitive scheme affected

13  prices for process potatoes: "[b]efore United [UPGA] was formed nearly all of the

14  process contracts were tonnage-based. As a result, process growers overplanted to avoid

15  penalties associated with not delivering enough potatoes to meet their contract. The

16  Potato Marketing Association of North America and processors began to switch the

17  contracts from tonnage-based to acreage-based contracts. Acreage-based contracts

18  minimized the uncertainty for the process grower and frozen processor while also

19  reducing excessive flow of potatoes from the process sector to the fresh sector. Graph #3

20  reveals the frozen processing usage volumes versus out of field contract prices in

21  Washington. [UPGA] has a data sharing agreement with PMANA [the

22  Potato Marketing Association of North America] to improve the profitability of process

23  growers."

24  242.   The "Graph #3" referenced by UPGA is as follows:

25

26

27                                                      -50-

CLASS ACTION COMPLAINT

28

243.     Thus, Defendants' and their co-conspirators' acreage restrictions, acreage

buydowns, and flow control measures caused potato prices to be fixed, raised,

maintained, and/or stabilized.

244.     Defendants' anticompetitive scheme has continued to the present. For example, a

May 2010 UPGA newsletter describes how 400 fresh and process potato growers in the

United States attended 16 United Potato Partners seminars this year at which they

"consider[ed] the latest about cost of production specific to their area, ponder[ed] current

demand data and review[ed] United's published acreage guidelines before beginning

spring planting." The seminars were designed to facilitate "informal discussions." As Mr.

Shahan was quoted as saying, "[t]hese seminars are one of the most important methods

we have for communicating United's published acreage planting guidelines to member

and non-member growers in a face-to face setting." At each of these seminars, a

represe\\ntative of Defendant Bayer CropScience was also present.

245.     Similarly, on its website, UPGI has a page devoted to its 2010 Planting

Guidelines, which were issued in September of 2009. UPGI has the following to say

about planting: Harvest is in full swing, and many are establishing plans for next

year's potato crop. By now, all of you already know the top line on this year's crop.

Across the state, it appears we are experiencing higher yields. If this continues, we could

have as much as 5% more potatoes statewide than expected. The same

thing is happening in Wisconsin and Colorado. They, too, are experiencing higher yields.

Your markets are already telling you what to expect. The GRI on Norkotahs today is

$4.66 and on Burbanks it is $5.52. Realistically, given the likely size of this

year's crop, we could easily see a larger than normal carry over

into next year.

**With this potential in mind, United of Idaho's Supply**

**Committee is in agreement with ALL of the United of America**

-51-

CLASS ACTION COMPLAINT

1 **Directors in recommending the follow planting guidelines for**

2 **next year. All growers are asked to plant 70-75% of their 2004**

3 **base in 2010 to BALANCE next year's crop with this year's**

4 **anticipated large carry over.** This recommendation to cut 25–

5 30% off your 2004 base acres will be finalized in November when

6 we have the final tally on this year's yields and production

7 nationwide. This same 70-75% planting guideline is extended to all

8 fry contract growers. (Emphasis added.)

9 246.    All Defendants involved in potato growing and selling operations herein

10 (including Wada Farms and Wada Farms Marketing Group (on behalf of themselves and

11 Dole Foods); Potandon (on behalf of itself and General Mills); Blaine Larsen Farms;

12 Michael Cranney doing business as Cranney Farms; Cornelison Farms; Snake River

13 Plains Potatoes; Driscoll Potatoes; Lance Funk doing business as Lance Funk Farms;

14 Rigby Produce; Pleasant Valley Potato; Raybould Brothers Farms; and RD Offutt) were

15 direct participants in the supply reduction scheme outlined herein and followed acreage

16 reductions, participated in the bid-buydown program, participated in and utilized

17 information obtained from marketing calls and packing reports, and/or reduced the

18 domestic supply of potatoes for the express purposes of fixing, raising, maintaining

19 and/or stabilizing prices.

20 247.    While certain aspects of UPGA's schemes have been publicly discussed, all

21 attendees to UPGA Board of Directors and Committee meeting attendees must have

22 signed a "United Confidentiality Agreement" each year and promised not to disclose

23 information shared at these meetings.

24 248.    Any violation of that agreement allows UPGA to exclude such person from future

25 meetings or to sue such a person in a court of law to halt disclosure and for damages

26 experienced by UPGA as a result of any such disclosure.

27

CLASS ACTION COMPLAINT

28

**II. Defendants are not Entitled to the Limited Protections of the Capper-Volstead Act**

249.    The Capper-Volstead Act provides an exemption from antitrust law for certain associations and cooperatives comprised of agricultural producers that meet specific criteria.  The Act protects an association and its members from antitrust scrutiny, provided that: (1) the association is operated for the mutual benefit of its members; (2) no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein, or that the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum; and (3) the association does not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members. The antitrust immunity provided by Capper-Volstead is "limited" and does not exempt all cooperative conduct         from review under the Sherman Act.

250.    The Capper-Volstead Act only protects "persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers." This phrase does not extend to a processor of agricultural products or any person or entity not engaged in farming, planting, ranching, and growing. Capper-Volstead Act immunity will not protect an association or any of its members if even one member fails to qualify as a "person[] engaged in the production of agricultural products."

251.    In a 1985 publication titled "Understanding Capper-Volstead," reprinted in 1995, the USDA stated that "if an association of producers . . . restricts members' agricultural output . . . [or] colludes with third parties to fix prices . . . [or] conspires with third parties to fix prices . . . [or] combines with other firms to substantially lessen competition . . . " then "it may find itself just as subject to prosecution for being in violation of the antitrust laws as would any other firm that engages in such practices."

252.    UPGI, UPGA and their co-conspirators have touted their purported immunity

-53-

CLASS ACTION COMPLAINT

1   from suit under the Capper-Volstead Act and have prominently featured the advice of

2   their antitrust lawyer (Randon Wilson of the Jones Waldo law firm) in publicly available,

3   nonprivileged documents as cover for their admitted supply-restriction efforts and

4   conspiracy to fix, raise, maintain and/or stabilize prices.

5   253.    As discussed below, however, none of the defendants herein is entitled to the

6   limited protections found in the Capper-Volstead Act for their efforts to restrict potato

7   supply and fix prices.

8   254.    UPGA and its co-conspirators' efforts at reducing potato supply prices fall outside

9   of the legitimate activities of the Capper-Volstead Act. UPGA, UPGI and their co-

10  conspirators have engaged in all of the activities discussed above, as well as others,

11  which have negated their ability to claim immunity from antitrust laws under the Capper-

12  Volstead Act.

13  255.    UPGA, UPGI and their co-conspirators are not entitled to the limited protections

14  found in the Capper-Volstead Act for at least the following reasons:

15  (a) UPGA and its members (including UPGI and the other member

16  cooperatives) are not legitimate cooperatives and they do not market,

17  process or sell potatoes—they are instead trade groups designed to serve

18  as forums for a nationwide (and continent-wide) agricultural supply restriction

19  agreement among competitors. Their efforts have improperly

20  and unduly enhanced prices;

21   (b) UPGA and its members are made up of vertically integrated producers that

22  are also packers and shippers in violation of the Capper-Volstead Act;

23  (c) UPGA and its members implement predatory conduct and impose

24  coercive, punitive and retaliatory measures against members that do not

25  comport with the supply reduction conspiracy;

26  (d) UPGA, its members, and co-conspirators have conspired and colluded

27

-54-

CLASS ACTION COMPLAINT

28

1   with third parties to reduce supply and fix prices;

2   (e) UPGA, its members, and co-conspirators have conspired and colluded

3   with non-member potato farmers to reduce supply and fix prices;

4   (f) UPGA, its members, and co-conspirators have conspired and colluded

5   with foreign entities, including the United Potato Growers of Canada and

6   Potato Marketing Association of North America, in an attempt to reduce

7   supply and fix prices for the North American continent;

8   (g) UPGA, its members, and co-conspirators have conspired and colluded

9   with non-member "partners" who are not engaged in agricultural

10  production and who have funded potato supply control efforts; and

11  (h) UPGI, its members, and co-conspirators have conspired and colluded with

12  "United II"—a non-grower, vertically integrated potato purchaser, to assist

13  with supply-restriction efforts.

14  **a. UPGA and its members operate as a price-fixing trade group, not a**

15  **legitimate cooperative.**

16  256.     UPGA and its individual cooperative members (collectively referred to herein as

17  "UPGA") do not engage in any of the functions enumerated under the Capper-Volstead

18  Act. UPGA does not grow, harvest, ship, sell, bargain or compete for the sale of potatoes

19  or any agricultural products. UPGA merely serves as a potato trade group and a forum for

20  a supply management scheme and a price-fixing agreement. These activities fall outside

21  the legitimate objectives of an agricultural marketing co-op.

22  257.     UPGA member cooperatives are made up of direct competitors rather than small

23  farmers banding together to cut out the corporate middlemen who would otherwise

24  market their potatoes. These cooperative members do not associate to collectively

25  process, handle, and market their products, and UPGA does not provide those services.

26  258.     UPGA does not wash, grade, package, store, transport, or distribute its members'

27

-55-

28  CLASS ACTION COMPLAINT

1  potatoes. UPGA does not negotiate contracts of sale for its members. UPGA does not

2  "market" its members' products. Rather, as set forth in its promotional materials,

3  publications, website, and numerous public statements, UPGA was founded for the

4  express purpose of implementing a scheme to manage and restrict the supply of potatoes.

5  259.    As discussed herein, UPGA's and UPGI's price fixing and supply reduction

6  efforts have unduly enhanced potato prices.

7  **b. UPGA and its member cooperatives have as members producers that are**

8  **also packers and shippers in violation of the Capper-Volstead Act**

9  260.    Mr. Wilson, UPGA's attorney, publicly discussed that shippers and packers could

10  not be affiliated with any Capper-Volstead Act potato cooperatives.

11  261.    The Capper-Volstead Act does not protect fully integrated producers that also

12  grow, pack, process, store, and ship potatoes.

13  262.    Many of the founders of UPGI and UPGA, as well as numerous other

14  coconspirators,

15  are integrated operators (called grower-shippers) that grow, pack, process, store,

16  and ship their own and other growers' potatoes.

17  263.    For example, Defendant Wada Farms operates a 140,000 square foot packing

18  facility in Pingree, Idaho. Wada also operates a 35,000 square foot Blackfoot, Idaho

19  facility with

20  partner Van Orden Enterprise.

21  264.    In addition to growing and shipping, Defendant Larsen Farms, one of founders of

22  UPGI, refers to itself as a "fully vertically integrated operation." Larsen Farms has an on-

23  site processing facility that cooks, dehydrates, mashes and further processes its potatoes.

24  265.    Other Idaho grower-shippers involved in the conspiracy alleged herein (some of

25  whom are named as Defendants) include, among others: Cummins Family Produce, Inc.;

26

27  -56-

CLASS ACTION COMPLAINT

28

1  Driscoll Potatoes; Floyd Wilcox & Sons, Inc.; Howard Taylor & Sons, Inc.; Pleasant

2  Valley Potato; Rigby Produce; and Snake River Plains Potatoes.

3  **c. UPGA and its member cooperatives impose predatory, coercive, punitive**

4  **and retaliatory measures against members that do not comport with the**

5  **supply reduction conspiracy.**

6  266.    Predatory conduct and coercive tactics are beyond the scope of any legitimate

7  business activity that may be protected by the Capper-Volstead Act.

8  267.    As discussed herein, UPGA utilized predatory conduct and coercive conduct in

9  ensuring compliance with the price-fixing scheme alleged herein. For example, UPGA

10 used satellite imagery, fly-overs, GPS systems, and other methods to enforce its

11 agreement to reduce potato supply.

12 268.    UPGA also instituted surprise audits and inspections of members' farms to

13 monitor compliance with its scheme.

14 269.    UPGA forced members to sign documents allowing UPGA board members access

15 to growers' confidential federal farm subsidy forms in order to ensure that members were

16 following its scheme.

17 270.    Members who did not comply with UPGA's supply restrictions were subject to

18 fines (of $100 per acre) and other punitive measures, such as removal from the

19 cooperative.

20 271.    UPGA also coerced non-members to join the price-fixing scheme and referred to

21 them as "free-riders" who were profiting from the conspiracy, but not reducing acreage.

22 **d. UPGA and its members have conspired and colluded with third parties to**

23 **reduce supply and fix prices.**

24 272.    Under the Capper-Volstead Act, members of a co-operative may not collude or

25 conspire with third parties.

26 273.    Yet UPGI, the Idaho grower cooperative whose founders also started the UPGA,

27

28 CLASS ACTION COMPLAINT

1   colluded with numerous third parties in seeking to control Idaho and national potato

2   acreage. For example, as discussed supra, UPGI entered into MOUs with PGI, SIPCO,

3   and SPGI to control potato supply in Idaho. These groups were not entitled to any

4   Capper-Volstead protections.

5   274.   UPGI and UPGA conspired with non-exempt, packer and warehouses in

6   implementing flow control measures.

7   275.   As discussed in more detail *infra*, UPGA also colluded with non-member growers

8   in seeking control supplies.

9   276.   As discussed in more detail *infra*, UPGI also colluded with non-growers in

10   forming a joint venture with a potato dehydration plant that was designed to help its

11   efforts to reduce supply and fix prices.

12   277.   As discussed in more detail *infra*, UPGA also colluded with financial "partners"

13   that helped fund UPGA's supply-restriction efforts.

14   **e. UPGA, its members, and co-conspirators have conspired and colluded**

15   **with non- member potato farmers to reduce supply and fix prices.**

16   278.   UPGA and its regional co-operative members routinely coerced and conspired

17   with non-members in seeking to reduce potato supply and explicitly recognized the

18   importance of having non-members follow their planting reductions and other supply-

19   restriction efforts.

20   279.   In a publicly disclosed interview on UPGA's website, not subject to attorney

21   client privilege, UPGA's attorney, Randon Wilson stated, "cooperatives wishing to

22   benefit from the limited antitrust protection afforded by the Capper-Volstead Act must

23   make sure that they do not enter into agreements with non-members to fix prices of limit

24   supplies. They cannot be predatory or unduly enhance prices." This advice was not

25   followed.

26   280.   UPGA and UPGI specifically sought out and allowed non-members to participate

27   

28   CLASS ACTION COMPLAINT

1    in their acreage reduction programs.

2    281.    On the same page as Mr. Wilson's advice above, UPGA discussed its

3    recommendations for 2010 based on the "assumption" that non-members would also join

4    its efforts to reduce supplies: "[UPGA's] recommendation for 2010 of planting 75

5    percent of 2004 base acreage takes into account the significant carryover that will

6    accompany the industry into the fall harvest of 2010. As a result of carryover, growers

7    producing for the out of field market in 2010 will likely need to cut beyond [UPGA's]

8    recommendations. **It should be noted that the [UPGA] recommendations are**

9    **still based on the assumption of non-members following the**

10   **same guidelines as [UPGA] members for their operations as well.** Please

11   consult with your United chapter for the latest information before you plant in 2010."

12   282.    UPGA's January 2006 newsletter stated that the co-operative "**invites all**

13   **nonmembers to attend their meetings, ask questions, and be a part of the**

14   **solution and not the problem.** We need every area in North America, big or small,

15   to participate. By working together, sharing information, and making smart business

16   decisions, we have the unprecedented opportunity to make this industry profitable."

17   (Emphasis added.)

18   283.    Mr. Shahan noted that these efforts to collude with non-members had paid off in a

19   Spud Smart article, titled "U.S. Production Stays Steady:"

20   Shahan says potato growers have really taken to UPGA's efforts.

21   "Growers have seen the wisdom of matching supply to demand so

22   they're much more educated in a side of the industry they have

23   not understood before," says Shahan. **"Curiously, the nonmembers**

24   **are even receptive to the program, because it brings**

25   **science to what has been sorcery."** (Emphasis added.)

26   284.    Thus, non-members were not only invited to participate in the price fixing scheme

27                                                    -59-
     CLASS ACTION COMPLAINT
28

1   discussed herein, but they did actively participate at UPGA's direction and request.

2   285.    Shermain D. Hardesty, an agricultural economist that does work for UPGA, also

3   noted that UPGA's leaders colluded with nonmembers to achieve compliance with

4   supply reduction efforts:  Because it is a voluntary organization, UPGA is facing the free

5   rider problem.  Nonmember producers benefit from the higher and more stable prices

6   achieved, without having to reduce their acreage and control their sales flows. **UPGA's**

7   **leadership is striving to impress upon nonmembers the need for**

8   **compliance and the significant additional benefits that could be derived by**

9   **all producers from such cooperation.** (Emphasis added.)

10   286.    In January of 2008, Defendant United Fresh Potato Growers of Colorado reported

11   on the UPGA Board of Directors Meeting in its newsletter:

12   Mike Cranney, Supply Management Committee Chairman,

13   reminded the attendees that in 2008 United's direction is that all

14   United members will reduce acreage by five percent off of 2007

15   plantings. **Non members will be urged to do the same.**

16   (Emphasis added.)

17   287.    In December of 2008, in a special edition of its newsletter, the UPGA made a

18   direct appeal to its members to reach out and conspire with nonmembers to limit supply

19   in "United to growers: limit '09 acreage for survival":

20   Following an in-depth review of 2008 planting, production and

21   storage data contrasted with ongoing falling demand for fresh

22   potatoes and with an eye on a rocky, world-wide economy, the

23   United Potato Growers of America board of directors decided at a

24   December board meeting to strongly urge all fresh potato growers

25   to plant no more acreage in 2009 than they planted in 2008.

26   **Members asked to reach out to their neighbors**

27                                              -60-

28   CLASS ACTION COMPLAINT

**All members and co-op leaders are asked to immediately make a strong effort to reach out to members and non-members** in their growing region to impress upon them the urgent necessity to freeze or even reduce fresh acreage in 2009. **Everyone, including non United members, is asked to join United in an effort to manage supplies by limiting acreage in 2009.** (Emphasis added.)

288.    UPGA's then-CEO Julia Cissel prepared a PowerPoint presentation dated December 7, 2006, which explicitly encouraged non-member participation several times. One slide read as follows:

Conclusion: Supply Management depends on YOU!

1) Manage your acres

2) Insist on reasonable returns

3) Engage and collaborate

4) **Convince non-members to follow . . . they win too!**

5) DO THE RIGHT THING! (Emphasis added.)

289.    In another UPGA PowerPoint, entitled "Report for 2008 Plan for 2009," UPGA again encouraged engagement with non-members. One slide read:

United's Plans for 2009 What is the market's fundamental and guiding principle? Supply and demand is a real economic principle, and one that potato growers can manage **Become a missionary: befriend all growers and encourage them to heed marketplace dynamics** (Emphasis added.)

290.    UPGI's April 2009 newsletter clearly identified the group's willingness to incorporate non-member participation: Inventory Management If acreage management isn't enough, United will be prepared with the option of implementing an Inventory Management Program.

-61-

CLASS ACTION COMPLAINT

1    However, in order to implement such a program, the following

2    guidelines must be met:

3    _ 75% member and base acre agreement to initiate the action

4    _ 75% member and base acre ratification to implement

5    **_ A set percentage non-member participation for**

6    **members to ratify** (Emphasis added.)

7    **f. UPGA, its members, and co-conspirators have conspired and colluded**

8    **with foreign entities in an attempt to reduce supply and fix prices for the**

9    **North American continent**

10   291.    The Capper-Volstead Act does not protect non-United States farmers or

11   cooperatives, nor does the Act protect domestic cooperatives that conspire with non-

12   protected entities, such as foreign producers, to reduce global agricultural supply.

13   292.    In implementing the output restriction scheme discussed herein, UPGA has

14   conspired with a Canadian potato association and a North American growers association

15   made up of many Canadian growers.

16   293.    UPGA and UGPC are admittedly jointly managing North American potato

17   supply.

18   294.    The UPGA and UPGC have an interest in preventing lower-priced imports from

19   each other's members. By jointly agreeing on supply restrictions, each can limit or

20   minimize the deleterious effects of low-priced imports flooding their market.

21   295.    A substantial amount of Canadian potatoes are imported into the United States

22   each year. For example, Agriculture and Agri-Food Canada reported the following:

23   In 2006-07, 118,926 tonnes of seed potatoes valued at $39 million

24   and 471,491 tonnes of table potatoes valued at $145 million were

25   exported. That same period, 970,000 tonnes of frozen French fries

26   were also exported, making Canada the second largest french fry

27                                    -62-

28

1   exporter after the Netherlands. The United States is Canada's

2   main market for potatoes and potato products; 74% (by value) of

3   Canadian potato exports were destined for the United States in

4   2007.

5   296.    Just as the United States is a very important export market for Canadian potato

6   producers, Canada is an extremely important export market for United States potato

7   producers. The Office of the United States Trade Representative noted in November of

8   2007: Canada is the United States largest export market for agriculture,

9   including potatoes. In 2006, the United States exported $92.8

10  million in potatoes to Canada, representing 68.73 percent of all

11  U.S. potato exports. Since 2004, U.S. potato exports to Canada

12  have increased by 38.13 percent.

13  297.    As noted above, prior to UPGC's formation in August of 2005, representatives of

14  seven potato producing provinces in Canada comprising more than 96% of the potato

15  acreage in Canada met with the board of directors of the UPGA in Toronto. The

16  expressed purpose of this meeting was to "jointly consider 'cross border' programs and

17  cooperation that will greatly improve profitability for all growers in both countries." At

18  the Toronto meeting, Canadian growers agreed to form a steering committee with

19  representation from each province to define more concretely methods for collaborating

20  between provinces and establishing a formal link with the UPGA.

21  298.    UPGC was formed in February 2006 with the assistance of UPGA. In its Fall

22  2007 newsletter (which is publicly available and thus not privileged), the UPGC

23  discussed its formation and the "legal advice" it received regarding collaborating with a

24  U.S. cooperative: To my recollection the initial rational[e] for establishing this

25  Corporation was that the U.S. had just formed a National Co-

26  Operative (United Potato Growers of America), the Anti-Trust

27                                              -63-

28  CLASS ACTION COMPLAINT

1  laws in the U.S. are such that an organization of this nature could

2  possibly face legal issues, but there is a remedy for properly

3  constituted agricultural co-operatives in the U.S. in the form of the

4  Capper-Volstead Act. **Legal opinion advised us, that as**

5  **Canadians we would need to join this U.S. cooperative in order**

6  **to communicate/cooperate with our U.S. friends and associates**

7  **in their new cooperative.** Thus the need to have a National group that could join our

8  U.S. counterparts. (Emphasis added.)

9  299.   In April of 2006, Spudman magazine reported that Gary Sloik, co-chairman of

10  UPGC's steering committee, stated that his group and the UPGA would work closely

11  together, and that Mr. Sloik stated that "[o]ur market is their market, and their market is

12  our market. It's all one big puzzle."

13  300.   The UPGA states on its website that it assisted in the formation of UPGC in 2006

14  and also states that "[d]iscussions are ongoing with growers in other countries." The

15  UPGA further states that it "has a data sharing arrangement with the UPGC." UPGA, on

16  its website's FAQ section regarding its United Potato Partners Program, states "United

17  reaches 80 percent of U.S. and Canadian potato growers by providing them with market

18  intelligence that can improve profitability." The UPGA organization chart depicted

19  *supra* the presence of UPGC as part of UPGA's structure.

20  301.   In February of 2007, UPGA and UPGC held a joint meeting in Las Vegas, along

21  with the PMANA. Sixty growers were in attendance. According to a press release the

22  groups issued, at this meeting the growers agreed to "collaborate" and work together to

23  reduce supplies across North America. Specifically, the groups agreed to work together to

24  eliminate speculative potato planting and manage 2007 plantings. The groups also agreed

25  to a uniform data gathering and analysis program.

26  302.   Albert Wada, UPGA's chairman at the time, discussed this joint meeting, stating:

27

28

-64-

CLASS ACTION COMPLAINT

1   "[w]e are continuing our efforts and working together for a sustainable payday for all

2   potato growers. We have made significant progress over the last year, and agreed that the

3   level of collaboration among our three grower cooperatives will be heightened in 2007."

4   303.     In its Winter 2007 newsletter, UPGC noted that one of the benefits of joining it

5   was that "UPGC offers a unique opportunity to partner with two strong U.S. Potato

6   organizations [sic] United Potato Growers of America and Potato Marketing Association

7   of North America (the potato industry is global)." UPGC also noted that the "US is our

8   largest trading partner, it is critically important to be connected." The newsletter also

9   featured an "open letter" from Mr. Shahan to the members of the UPGC, that, among

10  other things, stated that "[w]e can now put all of our varying situations together into a

11  master plan . . . ."

12  304.     In its PowerPoint presentation entitled "Report for 2008 Plan for 2009," UPGA

13  also discussed its work with foreign entities: "Worked to further trade between U.S. and

14  Mexico for fresh potatoes"

15  _ "Worked to achieve more current reporting for Canadian

16  fresh-potato imports"

17  _ "Improved United of Canada structure and effectiveness"

18  _ "There is now a United of Europe"

19  _ "The UK will have a similar structure soon"

20  305.     In July of 2008, The *Journal Pioneer* reported on the collective impact that

21  UPGA, UPGC, and PMANA were having on reducing potato supplies:

22  Teamwork can bring impressive benefits, says Buzz Shahan, chief

23  operating officer of the United Potato Growers of America.

24  U.S. potato producers were able to slash planted acreage for 2008

25  by eight percent, or about 81,000 acres, firming up prices in the

26  process. Idaho, the largest potato producer in North America, led

-65-

27

CLASS ACTION COMPLAINT

28

1   the way with a 14 percent cut. Meanwhile, the (Prince Edward)

2   Island's cut [in Canada] was cut by 3,000 acres over 2007, to

3   93,000 acres. "PEI growers have certainly pioneered the effort, they have

4   already developed their systems (for managing potato production)

5   in a very sophisticated way, but everybody else across the country

6   needs to collaborate with PEI," said Shahan, a keynote speaker at

7   province-wide meeting for growers, held Wednesday (Aug. 6)

8   night at the Loyalist Lakeview Resort.

9   . . . .

10   Shahan says the U.S. potato industry is seeking three cents more a

11   pound for its producers. That works out to $10 a hundredweight

12   instead of $7 and that's an enormous boost for them.

13   . . . .

14   PEI . . . was a big player in the formation of the United Potato

15   Growers of Canada in 2006, which restrained production and

16   boosted prices.

17   Shahan said American producers have been able to share a

18   massive database of information about everything from shipping

19   and marketing to planting—in fact nearly everything involved in

20   raising and selling potatoes. That has played a major role in

21   increasing prices and demand.

22   **g. UPGA, its members, and co-conspirators have conspired and colluded**

23   **with non-member "partners" who are not engaged in agricultural**

24   **production and who funded potato supply control efforts**

25   306.    UPGA has "partnered" with non-agricultural producing companies that explicitly

26

27                                                    -66-

28

1    conspire with UPGA and assist in its efforts to reduce potato supply so that the

2    companies can have access to UPGA members to sell their products.

3    307.    UPGA's website discusses this "United Partners Program" as a "strategic

4    alliance" by which partner companies help offset UPGA's costs in implementing its

5    supply restriction scheme:

6    Q: What is the United Potato Partners Program?

7    A: The United Potato Partners Program has three objectives: 1.

8    Maximize the price the potato producer receives for his annual

9    crop. 2. Minimize the cost of gathering the market data that allows

10   the producer to maximize price. 3. Provide manufacturers of cropinput

11   products a direct link to their grower-users.

12   The market intelligence supplied by United's database matches

13   supply to demand such that grower returns remain positive and

14   stable. Financially healthy growers can afford healthy budgets.

15   **There is a cost to acquiring, analyzing, and implementing the**

16   **data relating to potato markets. Until now, these costs have**

17   **been borne by United's growers. Corporations that supply**

18   **potato growers with everything from potato handling**

19   **equipment, to tractors, to field chemicals and fertilizers,**

20   **irrigation equipment, and packing and packaging equipment**

21   **can now, through a carefully structured program, offset the**

22   **cost of the database nationally and regionally.**

23   (Emphasis added.)

24   308.    UPGA's March 2009 newsletter further discussed this "partnership" program:

25   "[a]mong other benefits, the partner program reduces the costs to member growers of

26   developing and maintaining United databases that are critical to grower sustainability."

27                                              -67-

CLASS ACTION COMPLAINT

28

The 2009 partners were: Defendant Bayer CropScience, AMVAC Chemical Corporation and WinField Solutions.  Further specific activities of Bayer CropScience in connection with the UGPA have been discussed above.

309.    Lee Frankel, UPGA's CEO, stated, "We are pleased that our partners are realizing the strategic benefits of teaming up with United as a means of reaching the potato grower directly and have chosen to extend their partnership with us. We definitely value the contributions of ideas and financial support of these agricultural corporations as United Potato Partners and look forward to another successful year for the potato industry overall. Growers should remember to thank our partners for their support by supporting them through purchases and use of their products when appropriate."

310.    These partners were aware of and supported the supply reduction price-fixing conspiracy alleged herein. For example, UPGI's April 2009 newsletter noted that at "the recent United Potato Partners meeting in March, [UPGI] announced its planting guidelines and inventory management for 2009-10."

**h. UPGI, its members, and co-conspirators have conspired and colluded with a non-grower, vertically integrated potato purchaser, to assist with supply restriction efforts**

311.    In 2007, UPGI facilitated the formation of a joint venture (Defendant Idahoan Foods) to create the second largest potato dehydrator in the country, as well as a second co-op to supply potatoes to this venture. The explicit and publicly stated purpose of this joint venture was to assist UPGI in reducing potato supply.

312.    As part of this transaction, UPGI formed United II, a second co-op based in Idaho Falls, Idaho. All UPGI members were able to join the new co-op (and had to join to be able to sell potatoes to the venture). With RD Offutt Co., United II next formed a joint venture, North American Foods, LLC. This joint venture purchased Idaho Fresh-Pak, Inc. ("IFP")—the country's third largest potato dehydration company. The purchase included

-68-

CLASS ACTION COMPLAINT

1    IFP's four Idaho plants and the "Idahoan" brand names. RDO contributed its three

2    dehydration plants located in North Dakota, Nevada, and Idaho along with its production

3    agreement with Idaho Supreme Potatoes, Inc. Under a formula-based pricing

4    arrangement, United II growers supply all the potatoes for the Idaho and Nevada plants.

5    313.    United II potato growers have ownership of the new company, receive dividends,

6    and have a guaranteed market for their dehydrator-grade potatoes.

7    314.    In a 2007 article in the USDA's "Rural Business - Cooperative Service," Jerry

8    Wright, president of UPGI, discussed the formation of this venture as being intended to

9    help reduce supplies:

10   "Since forming two-and-half-years ago, United has proven its

11   ability to manage flesh potato supplies, meet and match demand,

12   and improve grower returns," said Jerry Wright, United president

13   and CEO. "**This new venture will not only lead to a more stable**

14   **dehydrator industry, but also serve as an important tool for**

15   **growers to balance their fresh crop and fresh industry**

16   **marketing pipelines, all with the objective of improving**

17   **grower returns**. As a result, potato growers, our communities and

18   the entire industry will benefit."

19   . . . .

20   "This new venture is another in a series of strategic initiatives by

21   United to improve potato grower returns," says Wright. **"The**

22   **fresh and dehydrator industries work hand-in-hand. By**

23   **maintaining a fair dehydrator price, fresh grower returns also**

24   **improve. This new dehydrator company also provides United**

25   **with an outlet for surplus potatoes.** Through United, growers

26   have access to market data and facts that are crucial to their

27                                                          -69-

     CLASS ACTION COMPLAINT
28

1  marketing. Through United II, growers who invest will have the

2  opportunity to earn dividends while having a reliable market for

3  their dehydrator-grade potatoes."

4  . . . .

5  **"Potato growers will now be integrated vertically into the**

6  **overall industry system," says Wright**. "Through United II, we

7  will create efficiencies from the development of seed to

8  production to marketing. We anticipate greater long-term stability

9  and no more boom or bust cycles." (Emphasis added.)

10  315.  UPGI also discussed the venture in its March 2007 newsletter and stated "**United**

11  **of Idaho [UPGI] feels that the current dehy strategy being implemented is**

12  **critical to United's overall mission of supply management**." (Emphasis added.)

13  316.  In December of 2007, UPGI announced the new "Idahoan Fresh Potato Plan" as

14  part of this venture and as a means to further control supplies and fix prices where UPGI

15  proposed that growers sell 100% of their potatoes to Idahoan Fresh.

16  317.  Jerry Wright, UPGI's president, outlined the plan as follows:

17  1. The first step happened when United II entered into partnership

18  with R.D. Offutt Company and purchased Idahoan Foods.

19  Growers now own the largest dehydrator in North America.

20  2. Starting in December, United will meet with groups of growers

21  in each district to review the program and ask for your

22  commitment. To meet the demands of the lender, a majority of

23  growers will need to sign their contract between January and

24  March of next year. The program will start selling potatoes in

25  September 2008.

26  3. Along with grower meetings, United will schedule shed

27

-70-

28  CLASS ACTION COMPLAINT

1  meetings with the goal of consolidating sheds. Sign up will start

2  in April 2008. As part of the plan, sheds can join a "merged

3  ownership" pool with full equity ownership in NewCo or join a

4  "lease group" where the shed owners maintains ownership and

5  leases the facilities to NewCo. The presentation will also cover a

6  fair exit strategy for owners based on a common valuation format

7  offering cash with terms. NewCo can acquire inefficient sheds

8  and close them, making up the purchase cost through increased

9  efficiencies at the remaining sheds.

10 4. The final step involves creating a coordinated sales and

11 marketing system for the Idahoan potatoes. Growers and shed

12 owners will see, at minimum, a system overview during the group

13 meetings at the beginning of the year. Growers who commit their

14 potatoes will receive cash payment on a staggered schedule. For

15 all quality potatoes (based on independent harvest, cellar, and

16 shed inspections), growers will receive $2.00/cwt as a down

17 payment in October. After a successful holding period, growers

18 will receive an additional $2.00/cwt in December. Then, based on

19 market returns, growers will receive up to $1.25 in February.

20 Growers will receive the balance of their returns, based on the

21 market for the year, in September. Minus administrative expenses,

22 growers will receive 100% of the up, a change from the current

23 grower/shed relationship. The final settlement will reflect each grower's individual pack

24 out and crop quality. To join, a grower must be a United member in good standing and

25 adhere to the 2008–09 Acreage Planting Guidelines (reduce 20%

26 off of 2004 acres). This acreage based contract requires 100%

27
-71-

28 CLASS ACTION COMPLAINT

1  commitment of the fresh crop, with Idahoan Fresh honoring prior

2  process grade and shed commitments.

3  318.    In the PowerPoint entitled, "Pacific Coast National Bargaining Conference &

4  Sherman Hardesty, UPGA COO Buzz Shahan cited this vertical expansion as part of

5  UPGA's philosophy. The relevant slides read: Philosophy of UPGA

6  _ What is Sustainable Agriculture? Sustainable agriculture produces rational on-farm

7  profitability year after year _ What is rational on-farm profitability?

8  _ Rational on-farm profitability facilitates equity growth

9  **Equity growth does not have to be linear, but can**

10  **include vertical and horizontal expansion**

11  An Example of Vertical Expansion!

12  **_ North American Foods World's largest supplier of dehydrated potato**

13  **products Rollup included UPGI, called UPGI II, or U II, and**

14  **included three other entities Stock offered to UPGI members** (Emphasis

15  added.)

16  **EFFECTS OF THE DEFENDANTS' ILLEGAL COURSE OF CONDUCT**

17  319.    Defendants' conspiracy had the following effects, among others:

18  (a) Price competition among the Defendants and their co-conspirators in the

19  sale of potatoes was restrained and suppressed;

20  (b) Prices of potatoes manufactured and sold in the United States by the

21  Defendants and their co-conspirators were fixed, raised, maintained and/or

22  stabilized at supracompetitively higher, non-competitive levels; and

23  (c) Direct purchasers of potatoes, including Plaintiff and Class members, were

24  deprived of the benefits of free and open competition in the purchase of

25  potatoes.

26  320.    Defendants' contract, combination and conspiracy described herein consists of a

27

28  CLASS ACTION COMPLAINT

1   continuing agreement, understanding and concert of action among the Defendants and

2   their coconspirators, the substantial terms of which were to artificially fix, raise,

3   maintain, and/or stabilize prices paid by Plaintiff and Class members for the direct

4   purchase of potatoes in the United States, its territories and possessions.

5   321.   In formulating and effectuating the contract, combination or conspiracy,

6   Defendants and their co-conspirators did those things that they unlawfully combined and

7   conspired to do, including, among other things: agreeing to artificially fix, raise, maintain

8   and/or stabilize prices for potatoes in the United States; and implementing and

9   monitoring the conspiracy among cartel members.

10   **INJURY TO PLAINTIFF AND CLASS MEMBERS**

11   322.   The activities described above have been engaged in by Defendants and their

12   coconspirators for the purpose of effectuating the unlawful agreement to fix, raise,

13   maintain and/or stabilize the prices for potatoes sold in the United States.

14   323.   As a direct and proximate result of the contract, combination and conspiracy

15   alleged herein, Plaintiff and other members of the classes were, and continue to be,

16   damaged in their business or property in that they paid supracompetitive prices for

17   potatoes products during the Class Period, higher than that which they would have paid in

18   the absence of the contract, combination, and conspiracy.

19                           **FIRST CAUSE OF ACTION**

20           **Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1**

21                           **(Against All Defendants)**

22   324.   Plaintiff incorporates and re-alleges each allegation set forth in the preceding

23   paragraphs of this Complaint.

24   325.   Beginning at least as early as 2003, and continuing to the present day, Defendants

25   and their co-conspirators, by and through Defendants' and co-conspirators' officers,

26   directors, employees, agents, or other representatives, entered into a continuing contract,

27                                   -73-
   CLASS ACTION COMPLAINT
28

1  combination and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or

2  stabilize the prices paid by Class Members for their purchases of potatoes in the United

3  States and its territories and possessions (through, *inter alia*, agreed upon reductions in

4  potato capacity), in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

5  326.    Defendants' unlawful conduct resulted in artificially fixed prices charged by

6  Defendants and their co-conspirators to Plaintiff and the members of the Class for their

7  purchases of potatoes.

8  327.    Plaintiff and the members of the Class paid more than they otherwise would have

9  for their purchases of potatoes in a competitive marketplace, were thus damaged, and

10  seek to recover for those damages.

11  328.    As a direct and proximate result of Defendants' scheme, Plaintiff and the

12  members of the Class have been injured and financially damaged in amounts which are

13  presently undetermined. Plaintiff's and Class members' injuries consist of paying more

14  for their purchases of potatoes than they would have paid absent Defendants' conduct.

15  Plaintiff's and Class members' injuries are of the type the antitrust laws were designed to

16  prevent and flow from that which makes Defendants' conduct unlawful.

17  **SECOND CAUSE OF ACTION**

18  **(Violations of the Cartwright Act,**

19  **Cal. Bus. & Prof. Code §§ 16720, *et seq.*)**

20  329.    Indirect Purchaser Plaintiffs incorporate by reference all the above allegations as

21  if fully set forth herein.

22  330.    By reason of the foregoing, Defendants have violated California Business and

23  Professions Code, §§ 16700, *et seq.* California Plaintiff on behalf of a nationwide class

24  of Indirect Purchasers alleges as follows.

25  331.    Beginning at a time currently unknown to California Plaintiff, but at least as early

26  asJanuary 1, 2004, and continuing thereafter at least up to the filing of this complaint,

27

28  CLASS ACTION COMPLAINT

1  Defendants and their co-conspirators entered into and engaged in a continuing unlawful

2  trust in restraint of the trade and commerce described above in violation of section 16720,

3  California Business and  Professions Code. Defendants, and each of them, have acted in

4  violation of section 16720 to fix, raise, stabilize, and maintain prices of, and allocate

5  markets for potato products at supracompetitive levels.

6  332.    In particular, Defendants have combined and conspired to raise, fix, maintain or

7  stabilize the prices of potato roducts sold in the United States.

8  333.    As a result of Defendants' unlawful conduct, prices for potato products

9  were raised, fixed, maintained, and stabilized in the United States.

10  334.    The contract, combination or conspiracy among Defendants consisted of a

11  continuing agreement, understanding, and concerted action among Defendants and their

12  coconspirators.

13  335.    For purposes of formulating and effectuating their contract, combination, or

14  conspiracy, Defendants and their co-conspirators did those things they contracted,

15  combined, or conspired to do, including:

16  a. Participating in meetings and conversations to discuss the prices and supply

17  of potato products.

18  b. Communicating in writing and orally to fix prices of potato

19  products.

20  c. Agreeing to manipulate prices and supply of potato products sold

21  in the United States in a manner that deprived direct and indirect purchasers

22  of free and open competition.

23  d. Issuing price announcements and price quotations in accordance with the

24  agreements reached.

25  e. Selling potato products to customers in the United States at non-competitive

26  prices.

27

28  CLASS ACTION COMPLAINT

1   f. Providing false statements to the public to explain increased prices for

2   potato products.

3   336.     As a direct and proximate result of Defendants' unlawful conduct, California

4   plaintiffs and the members of the California Indirect Purchaser Class have been injured in

5   their business and property in that they paid more for potato products than they otherwise

6   would have paid in the absence of Defendants' unlawful conduct. As a result of

7   Defendants' violation of Section 16720 of the California Business and Professions Code,

8   California Plaintiff and the California Indirect Purchaser Class seek treble damages and

9   their cost of suit, including a reasonable attorney's fee, pursuant to section 16750(a) of

10   the California Business and Professions Code.

**THIRD CAUSE OF ACTION**

**(Violations of California's Unfair Competition Law,**

**Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

14

15   337.     Indirect Purchaser Plaintiffs incorporate by reference the allegations in the above

16   paragraphs as if fully set forth herein.

17   338.     By reason of the foregoing, Defendants have violated California's Unfair

18   Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* California Plaintiff on

19   behalf of the California Indirect Purchaser Class alleges as follows.

20   339.     Defendants committed acts of unfair competition, as defined by section 17200, *et*

21   *seq.*, by engaging in a conspiracy to fix and stabilize the price of potato products as

22   described above.

23   340.     The acts, omissions, misrepresentations, practices and non-disclosures of

24   Defendants, as described above, constitute a common and continuing course of conduct

25   of unfair competition by means of unfair, unlawful and/or fraudulent business acts or

26

27                                                        -76-

CLASS ACTION COMPLAINT

28

1  practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1)

2  violations of Section 1 of the Sherman Act; and (2) violations of the Cartwright Act.

3  341.    Defendants' acts, omissions, misrepresentations, practices and nondisclosures are

4  unfair, unconscionable, unlawful and/or fraudulent independently of whether they

5  constitute a violation of the Sherman Act or the Cartwright Act.

6  342.    Defendants' acts or practices are fraudulent or deceptive within the meaning of

7  section 17200, *et seq.*

8  343.    Defendants' conduct was carried out, effectuated, and perfected within the state of

9  California. Defendants maintained offices in California where their employees engaged

10  in communications, meetings and other activities in furtherance of Defendants'

11  conspiracy.

12  344.    By reason of the foregoing, the Class is entitled to application of California law to

13  a nationwide class and are entitled to full restitution and/or disgorgement of all revenues,

14  earnings, profits, compensation, and benefits that may have been obtained by Defendants

15  as result of such business acts and practices described above.

16  WHEREFORE, Plaintiff prays as follows:

17                         **PRAYER FOR RELIEF**

18  A. That the Court determine that this action may be maintained as a class action

19  under Rule 23 of the Federal Rules of Civil Procedure;

20  B. That the contract, combination or conspiracy, and the acts done in furtherance

21  thereof by Defendants and their co-conspirators, be adjudged to have been in violation of

22  Section 1 of the Sherman Act (15 U.S.C. § 1) and California's Cartwright Act;

23  C. That judgment be entered for Plaintiff and members of the Class against

24  Defendants for three times the amount of damages sustained by Plaintiff and the Class as

25  permitted by law, together with the costs and expenses of this action, including

26  reasonable attorneys' fees;

27

-77-

28  CLASS ACTION COMPLAINT

1   D. That Defendants, their affiliates, successors, transferees, assignees, and the

2   officers, directors, partners, agents and employees thereof, and all other persons acting or

3   claiming to act on their behalf, be permanently enjoined and restrained from, in any

4   manner, continuing, maintaining or renewing the contract, combination or conspiracy

5   alleged herein, or from engaging in any other contract, combination or conspiracy having

6   a similar purpose or effect, and from adopting or following any practice, plan, program or

7   device having a similar purpose or effect;

8   E. That Plaintiff and Class members be awarded any available prejudgment and

9   post-judgment interest;

10   F. That Plaintiff and Class members have such other, further, and different relief as

11   the case may require and the Court may deem just and proper under the circumstances.

12

13                                    **JURY DEMAND**

14          Plaintiff demands a jury trial, pursuant to Federal Rule of Civil Procedure 38(b),

15   of all triable issues.

16   DATED: August 27, 2010

17                                    BY:

18                                           JULIO J. RAMOS (SBN. 189944)
                                             ramosfortrustee@yahoo.com
19                                           LAW OFFICES OF JULIO J. RAMOS
                                             35 Grove Street, Suite 107
20                                           San Francisco, California 94102
                                             Telephone:   (415) 948-3015
21                                           Facsimile:    (415) 469-9787

22                                           Attorneys for Plaintiff  MARTHA
                                             FLOREZ dba USULUTAN
23                                           RESTAURANT
                                             (additional counsel on signature page)

24

25

26

27                                    -78-

CLASS ACTION COMPLAINT
28